ALCAIDE, DEMANDANTE Y APELANTE, *v.* MORALES, DEMANDADA Y APELADA.

APELACIÓN procedente de la Corte de Distrito de Guayama en pleito sobre nulidad de reconocimiento de paternidad y negativa de alimentos definitivos.

No. 1883.—Resuelto en abril 8, 1920.

HIJOS NATURALES—RECONOCIMIENTO DE—NULIDAD DEL RECONOCIMIENTO—ACCIÓN PARA PEDIRLA—ESTOPPEL—PRESCRIPCIÓN.—Una persona tiene el derecho de

pedir la nulidad del reconocimiento de un supuesto hijo natural cuando- dicho acto es consecuencia de error, dolo, intimidación, violencia u otra causa semejante, y ni la doctrina de "estoppel in pais," ni la de "estoppel by laches" impiden el ejercicio de tal acción, que es prescriptible a los quince años. La prueba que se aporte en esos casos debe ser de tal manera robusta y convincente que al anular el reconocimiento hecho, la corte quede plenamente convencida de que esa y no otra es la resolución que impone la justicia.

ID.—NUEVO JUICIO.—Examinadas las circunstancias concurrentes en este caso, el Tribunal Supremo estimó que los fines de la justicia requerían la celebración de un nuevo juicio.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. Alvarez Nava & Domínguez* y *F. Soto Gras.*

Abogados de la apelada: *Sres. M. Benítez Flores* y *A. R. Barceló.*

EL JUEZ ASOCIADO SR. DEL TORO, emitió la opinión del tribunal.

Versa este pleito sobre nulidad del reconocimiento de una hija natural, pedida por el mismo padre que lo hizo. Simón Antonio Alcaide, por medio de sus abogados, radicó la demanda en la Corte de Distrito de Guayama, dirigida contra la menor María de los Dolores Morales, conocida por María de los Dolores Alcaide, y contra María Morales, madre de la menor, alegando en ella, en resumen, que el tres de octubre de 1900, bajo la creencia equivocada de que María de los Dolores era su hija natural, habida en sus relaciones amorosas con María Morales, pretendió reconocerla por medio de una nota que se puso al margen de la inscripción del nacimiento de la dicha María de los Dolores en el Registro Civil de Guayama; que al supuesto reconocimiento no concurrió ni consintió la madre natural; que el reconocimiento no constaba en testamento ni en sentencia, ni en otra forma escrita alguna y que la nota fué extendida por la simple manifestación del demandante; que realizó ese acto porque María Morales le indujo a creer, maliciosamente y a sabiendas de ser falso, que María de los Dolores era su hija, cuando lo cierto es que es hija de otra persona; que inmediatamente que conoció la verdad de los hechos, o sea a mediados del

año 1914, solicitó la nulidad del reconocimiento, y desde entonces viene trabajando en tal sentido; que fuera de la nota indicada, no existe escrito. alguno suyo reconociendo como hija a María de los Dolores, y que si bien es verdad que realizó otros actos de reconocimiento, actuó siempre bajo el error y el fraude expresados; que María de los Dolores jamás disfrutó de la posesión contínua de hija natural reconocida; que a virtud de ciertos procedimientos iniciados a nombre de la menor se le condenó por sentencia de 9 de marzo de 1916 a pasarle una pensión alimenticia y .el 20 de abril del mismo año se depositaron en la secretaría de la corte las pensiones reclamadas, lo que hizo bajo protesta; y que la menor, instigada maliciosamente por María Morales, pretende ostentar el estado de hija natural reconocida del demandante, usa su apellido y aspira a reclamar la herencia que pueda, a su muerte, dejar el demandante.

La demanda, que se archivó el 20 de abril de 1916, termina con la súplica de que la corte dicte sentencia declarando que María de los Dolores Morales, conocida por María de los Dolores Alcaide, no es hija natural del demandante; que la nota marginal que figura en el registro civil no constituye un reconocimiento y es nula por virtud de lo cual se ordenará su cancelación; que María de los Dolores Morales no tiene derecho a usar el apellido del demandante, ni a recibir de él alimentos, ni a percibir en su día porción alguna en la herencia del demandante y que las demandadas deben pagar las costas y devolver las pensiones alimenticias recibidas.

La demandada María de los Dolores Alcaide contestó alegando, como primera defensa, que el demandante la había reconocido voluntariamente (se describe la forma en que lo hizo), y en la actualidad estaba impedido de volver sobre su acto solemne e irrevocable; como segunda defensa, que la acción ejercitada había prescrito, y como tercera defensa, contestó cada uno de los hechos de la demanda. En resumen, la demandada sostiene que Alcaide actuó voluntariamente y no a insinuaciones fraudulentas de María Morales;

que se daba cuenta exacta de lo que hacía; que consta además el reconocimiento en cartas dirigidas por Alcaide a María Morales; que la demanda interpuesta por Alcaide en 1º. de junio de 1914 lo fué con el propósito de confabularse con María Morales obteniendo una sentencia a su favor por el allanamiento de la demandada, y cuando ésta se opuso, el demandante desistió de proseguir el pleito; que jamás ha procedido o ha sido instigada a proceder fraudulentamente, y que los actos que ha realizado y pretende realizar en el futuro constituyen el ejercicio de un derecho. María de los Dolores estableció además una contra-demanda en solicitud de una sentencia declarándola hija natural reconocida de Simón Alcaide.

También archivó su contestación la otra demandada María Morales, alegando las mismas defensas que su hija.

Trabada así la contienda, fué el pleito a juicio. El demandante comenzó por presentar la copia del acta de nacimiento de María de los Dolores. La nota marginal dice así:

"En 3 de octubre de 1900 siendo las diez de la mañana, ante don José García Salinas, compareció don Simón A. Alcaide y Baiz, natural de este pueblo, de treinta y cinco años de edad, soltero, propietario y domiciliado en la calle de Morse de esta localidad y expuso: que la niña inscrita en la presente acta María de los Dolores la reconoce como hija natural suya, de conformidad con el artículo 131 del código civil vigente: Que son abuelos por línea paterna don Antonio J. Alcaide y Dª. Estela Baiz, natural el primero de Andalucía y la segunda de Arroyo, ya ambos difuntos. Todo lo cual declaró ante los testigos don Eugenio Cruz Manatou y don Nazario Antonetti, mayores de edad y vecinos de este pueblo, solteros, empleados y firman con el declarante, luego del Sr. Juez y certifico. García Salinas.—S. A. Alcaide.—E. C. Manatou.—Nazario Antonetti.—José Aponte."

Luego declaró el propio demandante. Admitió que tuvo relaciones amorosas con María Morales desde 1894 hasta 1900, sosteniéndola y realizando actos carnales con ella continuadas veces, habiendo nacido María de los Dolores en 1897. Dijo que durante el período de las relaciones se ausentó

frecuentemente, a veces por largo tiempo; que "le profesaba cariño a María, le tenía mucho afecto y confiaba en ella, durante aquel tiempo no dió ningún motivo de sospecha"; que "la creencia del declarante respecto a la paternidad de María de los Dolores al momento de su nacimiento era que ella era la hija suya y así permaneció en esa creencia hasta más o menos el 1900 en que fué reconocida"; que "cuando María Morales fué a realizar el acto de la inscripción del nacimiento de su hija Dolores no lo solicitó ni lo invitó para que la reconociera; que después de extendida el acta de inscripción María Morales le halagaba para que la reconociera; que ella se iba a quedar sin padre, sin protección e insistía en que la reconociera"; que "después de 1900 que fué el reconocimiento empezaron los rumores de que ella no era hija suya, que lo había engañado, que le era infiel, que la conducta de María Morales era al parecer buena, que no continuó los amores después de 1900"; que "contrajo matrimonio en 1901." Expresa Alcaide que por el rumor público y por sus amigos se enteró de que la niña no era hija suya; que en su matrimonio no ha tenido hijos; que la convicción de que María de los Dolores no era hija suya la tuvo en 1904 a virtud de las manifestaciones que le hizo el Dr. Jesús M. Amadeo, al inquirir de él la razón de no tener hijos en su matrimonio. Hace referencia a la enfermedad, orquitis, que padeció en 1893, dando extensos pormenores. Al ser interrogado con respecto a cierta contradicción que se advertía entre su actual declaración y lo que había consignado en la demanda, contestó: "Como ya dije en 1905 tuve conocimiento de esto y lo fuí estudiando hasta el 1914 que interpuse la demanda". El testigo reconoció que "después de obtener la información de que habla y de tener la opinión del doctor Amadeo no varió su conducta con respecto a la niña, siguió pasándole la misma mensualidad y la puso en dos casas para sostenerla, pagando sus gastos mensuales". Hay otras manifestaciones del testigo con respecto a que no

fué hasta 1912 que llegó al pleno convencimiento de que María de los Dolores no era hija suya.

Luego declaró Arturo Menar y aseguró que su hermano Francisco visitaba a María Morales allá por el 1895; que "sobre la chica habló después con él y Pancho Menar la consideraba como su hija y siempre le decía que don Simón la reconocía como tal y que no era suya sino de él". Sobre este mismo extremo declararon los testigos Ramón R. Valencia, que entre otras cosas dijo: "Refiriéndose a Pancho Menar, lo veía en casa de María Morales cuando el Sr. Alcaide estaba en Maunabo y entonces visitaba la casa de María Morales de día y de noche"; Emilio Calimano, que expresó: "que hablaba con Pancho Menar en sus ratos de ocio y él le decía que sostenía relaciones amorosas con esta joven María Morales, que era entonces querida de don Simón Alcaide y que a ratos le daba pena y compadecía a don Simón al ver lo ciego que estaba con esta joven que siendo la querida de él sostenía relaciones con el otro, y mucho más lo compadeció después que reconoció a la niña que tuvo creyéndola su hija y que Menar tenía la convicción que fuera hija de él"; José R. Nieves que declaró que "tuvo oportunidad de hablar con Pancho Menar respecto a la paternidad de María Dolores, hija de María Morales, pues él era un poco indiscreto y lo decía descaradamente. Decía Menar que la tenía por su hija y frecuentemente hablaba que llevaba relaciones amorosas y carnales con María Morales"; y José Llorens Delgado que expuso que "Pancho Menar le indicó en varias ocasiones en conversaciones tenidas respecto a la paternidad de María de los Dolores, la hija de María Morales, que esa niña era hija de él". Cuando se celebró el juicio, Francisco Menar había muerto. Las declaraciones a que acabamos de referirnos en este párrafo se tomaron con la objeción de las demandadas.

El perito doctor Amadeo aseguró que había asistido y curado a Alcaide en 1893 de una orquitis doble que le había dejado impotente para tener hijos, y el otro perito, Angel

M. Pesquera, afirmó que en 1917 practicó el examen micros-
cópico del semen del demandante y el examen reveló "la
ausencia completa de espermatozoarios".

Presentó por último, el demandante, como prueba, una
copia de una demanda interpuesta en Guayama, en 1915, por
María Morales, en representación de su menor hija María
de los Dolores, solicitando que se dictara sentencia decla-
rando que Alcaide no era el padre de la menor, y la del
parecido entre el padre y la hija. No consta que se tomara
la fotografía que al parecer se acordó en el acto del juicio.
Con la transcripción, al menos, ninguna fué elevada.

Terminada la prueba del demandante, practicaron la suya
las demandadas. Declaró primero María Morales. Afirmó
sus relaciones con Alcaide durante un período de unos ocho
años y aseguró que como resultado de ellas nació María de
los Dolores. Negó que hubiera tenido contacto carnal con
Menar. y que hubiera incitado a Alcaide a reconocer a su
hija. En relación con este último extremo se expresó así:
"vine a saber que la había reconocido cuando le trajo el
reconocimiento; la fecha no la recuerda pero fué en el úl-
timo viaje que dió a los Estados Unidos antes de casarse,
cuando ya había traído el preparativo para casarse le trajo
el reconocimiento de la niña; cuando le llevó el reconocimiento
le dijo por la tarde, ¿por qué no viniste anoche? y contestó:
porque estaba ocupado; le dije: te casas, porque él me lo
negaba, y ahora es que te presentas. Y él me dijo: Sí, me
caso; y le dije: bendito, y mi pobre hija se queda sola; y
dijo: No, yo te cuidaré tu hija siempre; yo no te abando-
naré nunca; aqui tienes el reconocimiento de ella para que
veas que quiero a mi hija." Durante el curso de su decla-
ración se introdujeron como evidencia dos cartas de Alcaide
dirigidas a la testigo, que dicen así:

"Maunabo, Mayo 7/98,—Mi querida María.—Ayer te contesté tu
carta del 6 y no dudo que hoy recibiré alguna.—Me alegro que tú
y Lolita sigan sin novedad.—Yo bien pero fastidiado y con ganas
de estar en tu casa.—Estoy esperando el vapor por la mañana (do-

mingo) y no dudo que podré hacer un buen trabajo para concluir el jueves temprano. Te envio una cartita para Juan Alsiux, que le mandarás con Fernando o José, y él te mandará el diario, o se la dás cuando él pase.—Las cartas llevan desde ahora sellos de cinco centavos y no tres como antes, y por eso te envio algunos.—Pongo punto final a esta carta pues tengo que ir a la playa a ver cómo anda la cosa.—¿Y mi Lolita cómo sigue? Tengo muchos deseos de verla, está más gordita.—Dale muchos besitos a mi Lolita, y con muchos para ti de este que te quiere.—(f) Simón.—Memorias a los vecinos.— Supongo que las batatas te llegarán bien—veré si consigo yautías esta tarde.''

''Arroyo, P. R. Octubre 15 de 1898.—Querida María. Ayer de mañana me sorprendió encontrar en tu casa una carta dirigida a mi y tu en viaje para Maunabo. Tu carta está llena de insultos para este que creo que no te ha hecho más que bien, yo no creía que después de cinco años juntos, fuera el pago que yo debía recibir de ti. Tal vez sea algo que tenga que pagar. Me has privado de ver más a mi angelito, está bien, todo esto me lo merezco.—Tu casa está como la dejastes si deseas volver a ella y los pocos muebles que te he podido dar están a tu disposición, si es que deseas que se te envíen; y no que me dices que me los dejas para que ponga a otra en tu lugar. La mujer debe de tener juicio y no partir tan de ligero como lo has hecho tú.—¿Qué dirá el pueblo de todo esto? yo sé que me dirás que a ti no te importa y por eso me quieres tanto. Vuelvo y te digo que tu casa está aqui y yo pronto a recibirte, pues me considero que nada mal te he hecho. Pero en caso que no desees volver a mi lado, por lo mucho malo que he sido contigo, compadecete de ese angelito que nada sabe de esto—le escribo a don Ramón para que te dé el dinero que necesitas para ella, pues no deseo que mi Lolita sufra—Sabes que tengo en mi poder una póliza de seguros a favor de ella; y el reloj que te pertenece—avisa si quieres que te lo envie.—Mamá está muy delicada y si llegara a faltar, que Dios quiera no sea pronto, me iría lejos de este país.—Piensa bien lo que haces y no sea muchacha.—Me dices que te vás a rodar tú y tu hija; ¿Tienes algún motivo para esto? Contéstame con este peón que te envio y sabes te quiere siempre tu (f) Simón.—Avísame donde estás para pasarte tu diario.''

También presentaron las demandadas copias de ciertas actuaciones y la de una declaración prestada ante el Fiscal del Distrito de Guayama por Francisco Menar en la causa

de *El Pueblo* v. *Alcaide y otros,* por conspiración. Ya hemos dicho que Menar había muerto a la fecha del juicio. En su declaración Menar, si bien expresa que tuvo comercio carnal varias veces con María Morales cuando ésta era querida de Alcaide, expuso que fué como un año antes del nacimiento de María de los Dolores y niega repetidas veces que la niña sea hija suya, y que haya dicho tal cosa a otras personas. Terminaron las demandadas solicitando que les fuera permitido tomar declaraciones de peritos médicos de San Juan por medio de deposiciones. El demandante se opuso y la corte declaró sin lugar la solicitud.

La evidencia ocupa noventa páginas de la exposición. Solo hemos anotado de ella lo que nos ha parecido esencial para dar una idea exacta del caso. La corte de distrito la examinó y concluyó que demostraba que María de los Dolores no era hija de Alcaide por haber quedado éste impotente para engendrarla a consecuencia de la orquitis que padeciera en 1893, pero eso no obstante declaró la demanda sin lugar por estimar que Alcaide, dado el tiempo que dejó transcurrir sin ejercitar su acción, se hallaba impedido de volver sobre sus propios actos.

Contra la sentencia apelaron ambas partes. Esta que estudiamos es la apelación interpuesta por el demandante. La establecida por las demandadas se desestimó a solicitud del demandante.

Analizaremos los errores cometidos, a juicio del apelante. por la corte sentenciadora, por el orden en que han sido señalados.

Sostiene el apelante que el derecho del padre a impugnar el reconocimiento de un hijo natural, está sancionado por las sentencias del Tribunal Supremo de España de 25 de junio de 1910, 15 J. C. 489 (*sic*); 5 de enero de 1900, 89 J. C. 26 y 14 de enero de 1873, 27 J. C. 221; que en Puerto Rico las acciones no se pierden más que por ministerio de la ley, y que la acción ejercitada en este caso es de naturaleza personal y no tiene fijado por la ley un término es-

pecial de prescripción, cayendo por tanto dentro de la disposición general contenida en el artículo 1865 del Código Civil que fija para esa clase de acciones el término de quince años que no ha transcurrido aquí, motivos por los cuales alega que la corte de distrito erró al aplicar a este caso la doctrina del *estoppel* y al resolver, aplicándola, que Alcaide está impedido de ejercitar su acción.

Veamos en primer lugar si existe o no la acción ejercitada por el demandante. La parte apelante admite que no ha podido encontrar precepto de ley alguno que expresamente la reconozca y fije el período de tiempo en que pueda ejercitarse, pero invoca en apoyo de su existencia, además de las sentencias del Tribunal Supremo ya citadas, la máxima que dice que siempre que ocurra un perjuicio debe haber un remedio, reconocida y aplicada por esta Corte Suprema de Puerto Rico en el caso de *García v. García* et al., 18 D. P. R. 963. La parte apelada por el contrario sostiene que no hay tal acción y cita en apoyo de su teoría la opinión de Escriche.

Ninguna de las sentencias del Tribunal Supremo de España pronunciadas o publicadas el 25 de junio de 1910, guarda relación con este caso. Tampoco la que aparece en la página 489 del tomo 15 de la Jurisprudencia Civil. Las otras sentencias citadas lo han sido correctamente.

La de cinco de enero de 1900, 89 J. C. 26, establece la siguiente doctrina:

"Que el reconocimiento de un hijo como natural por los presuntos padres, que antes o después del reconocimiento contraen matrimonio, reviste al hijo del concepto y consideración de legítimo para todos los efectos legales atribuidos a estos hijos, sin que, supuesto tal reconocimiento, haya en nuestras leyes antiguas ni modernas precepto que autorice, en perjuicio de aquel, rectificación alguna arbitraria de semejante reconocimiento."

"Que cuando existe una posesión de estado de tal naturaleza, tampoco aparece permitida una mera investigación de la paternidad real de quien tuvo por hijo al que de aquella disfruta, como no sea para justificar cumplidamente que el hijo legitimado no reunía las

condiciones relativas que para poder serlo exige la ley, o la absoluta de no ser hijo de quien lo reconoció o por no haber podido procrearlo, o por serlo de tercera persona, pues que de otra suerte, supuesto el misterio que rodea la paternidad y la presunción de derecho de su certeza establecida en la ley por el fundamento del reconocimiento o de la posesión de estado, no puede legalmente prevalecer contra ella ninguna otra por vehemente que aparezca.''

Y los hechos que dieron origen a la misma, fueron los que siguen:

El duque de Sevilla contrajo matrimonio con doña Josefina Paradé en 1870 y reconoció como hija suya y de su esposa a una niña llamada María que procrearon antes de quedar unidos legalmente. Después de muchos años de casados nacieron dos hijos, Marta y Enriqueta, y la lucha existente desde el principio dentro del hogar se agravó al pensar en quien había de ser la heredera del ducado de Sevilla, si la hija que recordaba a la madre un pasado culpable o la mayor de las que habían nacido al amparo de un hogar legalmente constituído y opulento. Murió el duque. La hija reconocida obtuvo una declaración judicial en su favor en un procedimiento ex parte, y entonces la duquesa viuda de Sevilla inició el pleito de que se trata en representación de su hija Marta contra María, alegando que ésta no era en verdad su hija. Entre otras pruebas se presentó un documento suscrito por el propio duque en el que se dice:

''No sabiendo la suerte que la Providencia me reserva, y como sería fácil que mis días contados fueran, para la garantía de los intereses y derechos de mis amadas y pobres hijas Marta de Borbón y Enriqueta de Borbón, mis únicas hijas, que tan legítimas son, confío el presente escrito a mi muy amada esposa Dª. Josefina Paradé y Libié, Duquesa de Sevilla para que a falta mía pueda defender los derechos de los dos seres que tan queridos me son.—No habiendo tenido hijos en los primeros años de nuestro casamiento, creyendo que por el tiempo transcurrido ya no tendríamos esa dicha, a ruegos de mi mujer me decidí a dar mi nombre y hacerla pasar como hija mía a una niña que mi mujer había recogido, la cual estuvo en Paris con el nombre de María Paradé en la Pensión Bornier con el de María Sevilla en la de Madame Jourdani y con el mismo nom-

bre en otra de Angulema, hasta el día que llevó mi apellido, pasando desde entonces como hija nuestra.   Queriendo la Providencia concederme en 5 de mayo de 1880 a mi adorada hija Marta, y en 28 de junio del 85 a mi otra tan amada hija Enriqueta, la situación de mis hijas legítimas, mis verdaderas y únicas hijas, era demasiado crítica ante las pretensiones de la niña a quien por piedad había dado mi nombre y con el cual se la conoce en el Real Colegio de Santa Isabel (Madrid) ; y como si en un momento hice la locura de reconocerla, no puedo olvidar que, siendo padre cariñoso, cuáles son los deberes, la voz de la sangre y de la conciencia, así como el derecho que mis verdaderas hijas tienen para que nadie pueda nunca disputarlas lo que es suyo y que sepan la verdad de lo ocurrido.''

No obstante la afirmación escrita del padre y la actitud de la madre, el juzgado falló en favor de la demandada. Apeló la demandante y obtuvo en la audiencia la revocación del fallo.   Pero la demandada entonces interpuso recurso de casación para ante el Tribunal Supremo y éste revocó a su vez el fallo de la audiencia quedando en pie el del juzgado y doña María, la hija natural reconocida y legitimada por subsiguiente matrimonio, en posesión, por herencia de su padre, del ducado de Sevilla.

La otra sentencia citada por el apelante, o sea la de 14 de énero de 1873, 27 J. C. 218, se dictó en un pleito iniciado por doña Antolina González sobre nulidad de testamento.   Lorenzo Fuentes reconoció como hija natural suya en el acto del bautismo a cierta niña.   Luego Bruno Fernández, sargento mayor de los ejércitos de España, hallándose en capilla para ser fusilado, otorgó testamento y en él reconoció a la misma niña como hija natural suya habida en sus relaciones amorosas con Francisca Sanjuán, siendo ambos solteros.   La madre de Fernández, doña Antolina, impugnó el testamento.   Francisca Sanjuán alegó que era cierto que la niña era hija de Fernández y que lo ocurrido en el bautismo fué que temiendo que Fernández no reconociera a su hija y sabedor de ello su amigo Lorenzo Fuentes, se prestó a reconocerla como hija suya conociendo en verdad que no lo era.   La demanda fué desestimada, la sentencia del juz-

gado se confirmó en apelación y el recurso de casación establecido contra la última sentencia fué declarado sin lugar.

La jurisprudencia establecida quedó resumida así:

"Que al dar más valor a un testamento en que se declara y reconoce que una niña es hija natural del testador y se la instituye heredera, que a su partida de bautismo en que aparece que es hija también natural de otro, no se infringe el No. 4 del artículo 280 de la Ley de Enjuiciamiento Civil; porque al apreciar y dar preferencia o mayor fuerza a otros comprobantes que a dicha partida sacramental, no se desconoce que sea un documento público y solemne, según lo es para el caso, como anterior a la Ley del Registro Civil vigente.

"Que la ley 11 de Toro exige solamente para que el hijo se diga natural dos requisitos, que cuando nació o fué concebido, el padre pudiese casarse con la madre justamente sin dispensación, y que el padre le haya reconocido."

Aunque en ambas sentencias las demandas fueron finalmente declaradas sin lugar, es necesario reconocer la importancia de la jurisprudencia que en ellas se establece a los efectos de determinar la existencia de la acción sobre nulidad de reconocimiento de un hijo natural. La parte apelada sostiene sin embargo que no hay paridad entre los casos decididos por el Tribunal Supremo de España y éste que está sometido al Tribunal Supremo de Puerto Rico, y cita la opinión del tratadista Escriche que dice:

"Libre de reconocer o no reconocer a su hijo natural, no puede el padre, aunque sea menor, revocar el reconocimiento que legalmente hubiere hecho. Este reconocimiento, en efecto, no es una liberalidad propiamente dicha, sino la declaración de un hecho a la cual confiere la ley ciertas ventajas; pero una vez hecha esta declaración de paternidad, adquiere el hijo el estado de filiación de que ya no puede ser despojado." \* \* \*

"Todo reconocimiento de parte del padre o de la madre y aún toda reclamación de parte del hijo, podrán contradecirse por las personas que tengan interés en ello. El hijo, como primer interesado, puede combatir el reconocimiento que de él hiciera un hombre o una mujer que tuviese por extraños, haciendo ver que ni el uno podía ser su padre ni la otra su madre. La madre puede rechazar

también el reconocimiento de parte del pretendido padre, porque no debe dejarse al arbitrio de cualquier aventurero el hacerse pasar por padre del hijo de una soltera o viuda opulenta que hubiese tenido la desgracia de faltarse a sí misma. El padre igualmente puede repudiar el reconocimiento que tal vez en algún caso, aunque raro, hiciese por especulación una pretendida madre. En fin, todo reconocimiento hecho contra verdad puede combatirse por cualquiera individuo a quien perjudique.''

Las palabras de Escriche no tienen todo el alcance que les dan las apeladas. A nuestro juicio no es posible desconocer la existencia de la acción. Los razonamientos del caso de *García v. García et al., supra,* son aplicables. Puede concebirse que concurran circunstancias tales que reclamen la intervención y la acción de las cortes para anular el reconocimiento no obstante haber procedido voluntariamente el padre en el momento en que lo hizo. Además, si bien no existe precepto de ley alguno que directamente regule la cuestión, las disposiciones del legislador en relación con los hijos legítimos, indican su criterio en el sentido de la existencia de la acción. Nos referimos a los artículos 181, 182, 183, 184 y 185 del Código Civil Revisado. Claro es que la prueba que se aporte tiene que ser de tal manera robusta y convincente que al anular el reconocimiento voluntario hecho la corte quede plenamente convencida de que esa y no otra es la resolución que impone la justicia.

Habiendo llegado a la conclusión que antecede, surge enseguida la cuestión de si la acción se ejercitó dentro del tiempo concedido por la ley, o se había ya extinguido cuando Alcaide se resolvió a llevar el asunto a los tribunales.

Oigamos a este respecto al juez sentenciador. Dice, en su opinión, así:

''Cuando una persona voluntariamente ejecuta un acto con la intención de inducir a otro a actuar en la creencia del mismo, o cuando cualquiera que sea la intención, un hombre razonable, puesto en el lugar de otro, creyere que fué ejecutado el acto con la idea de que se actuase sobre él y en cualquier caso en que la otra parte actúe sobre él, y cambie o altere su situación, existe un *estoppel in*

*pais* que priva al primero de alegar contra el mismo, un estado de cosas diferente al que existe en la actualidad. *Newhal* v. *Hatch*, 64 Pac. 250; *Gerlash* v. *Turner*, 89 Cal. 4446; *Beunot* v. *Fremiulet*, 11 La. 1; *Deyer* v. *Woulfs* 39 La. Ann. 423; *Schroder* v. *Young*, 161 U. S. 334; *Armstrong* v. *A. Exch. N. B.* 133 U. S. 453; *Fields* v. *Killien* 129 Ala. 373; *Driscoll* v. *Smith*, 184 Mass. 221; *Scofield* v. *Farmer* 125 Mich. 470; *Woddhaven T. L. Co.* v. *Solley*, 148 N. Y. 42.

"Aplicando este principio tendremos que Alcaide voluntariamente compareció ante el Juez Municipal de Arroyo en 3 de octubre de 1900 y reconoció como hija suya a la menor María de los Dolores. Que después atendió a su educación y sostenimiento, públicamente la tuvo como hija y la trataba como tal, creando con sus actos un estado de hija natural reconocida que ha alterado la posición de dicha menor.

"Pero alega el demandante que él actuó en esa forma y reconoció a la niña por las insinuaciones y súplicas de la madre María Morales, quien le hizo creer que era hija suya de modo que su acto fué nacido del engaño y fraude de María Morales. Pero aparece de la prueba que el demandante conocía la enfermedad que padeció en el 1893, una de cuyas resultancias era la esterilidad; que tuvo conocimiento de su esterilidad en el 1904, y que sus amigos le indicaban que María de los Dolores no era hija suya, y sin embargo dejó pasar el tiempo sin ejercitar su derecho y no solamente no repudia las consecuencias de su acto, sino que continúa protegiendo a la menor María de los Dolores, teniéndola como hija natural de él, dando lugar con sus actos a que dicha niña fuera considerada por la gente como hija de él y de María Morales, nacida de sus relaciones amorosas.

"La negligencia de hacer algo que uno debe hacer o el dejar de ejercitar un derecho a su tiempo apropiado, se conoce propiamente como 'estoppel by laches' o sea impedido por falta de diligencia. 16 Cyc. 680; *Hunt* v. *Reilly*, 23 R. C. L. 471.

"Un silencio negligente puede crear un estoppel tan efectivamente como una representación expresa. *Tobias* v. *Morris*, 126 Ala. 535.

"No hay duda que el demandante ha sido negligente en el uso de su derecho. Esta niña nació en el año 1897, cuando Alcaide tenía más de treinta años, ya de un juicio maduro, reflexivo, sin embargo, teniendo a su alcance el investigar la realidad sobre la paternidad de la niña, no lo hace, y por el contrario la reconoce, bastándole las indicaciones de la madre, viviendo todos en Arroyo. Luego hace caso omiso de las indicaciones de sus amigos, contrae matrimonio y en 1904

tiene el convencimiento de que es estéril, y a pesar de todo esto sigue sosteniendo y manteniendo a la menor y asegurándola en su estado de hija natural. Pasa el 1904 y tarda 14 años para anular el error cometido por su ligereza de realizar un acto tan trascendental como es de reconocer un hijo sin cerciorarse de si realmente lo es suyo. No hay duda que esto demuestra un grado de negligencia tal que opera como un *estoppel* que le priva del derecho de destruir ese reconocimiento.''

No está perfectamente clara la opinión de la corte de distrito en cuanto a si el *estoppel* que aplica es el verdadero ''*estoppel in pais*'' o el conocido como ''*estoppel by laches*''.

Si es el primero, tenemos que concluir que no es aplicable a este caso, desde el momento que hemos aceptado que existe la acción para pedir la nulidad del reconocimiento voluntario hecho por el padre. Claro es que un padre que reconoce como suyo a un hijo, no puede, sin motivo justificado, porque así se le antoje, dejar él mismo o pedir a un tribunal que deje sin efecto el reconocimiento; pero si ese padre se convence de que aquel que reconoció como su hijo, no lo es, y tiene pruebas evidentes para así demostrarlo, la situación varía, pudiendo entonces volver sobre sus propios actos y pedir a la corte que restablezca la verdad de lo ocurrido.

Y si es el segundo, nos vemos obligados a convenir con la parte apelante y a tomar como base las reglas que para la prescripción de las acciones fija el Código Civil de Puerto Rico, prescindiendo de las establecidas independientemente por la jurisprudencia sobre el particular. Los períodos, transcurridos los cuales, el abandono o la negligencia en el ejercicio de las acciones, las destruye por completo, están expresamente fijados por el legislador en esta isla, y esos períodos y no otros son los que deben tomarse en cuenta por el tribunal sentenciador.

En el presente caso, de acuerdo con la ley, artículo 1865

del Código Civil, tratándose de una acción personal que no tiene señalado un término especial de prescripción, Alcaide tenía quince años para ejercitarla, y como no llegaron a transcurrir esos quince años . desde que Alcaide estuvo en condiciones de entablar el pleito hasta que interpuso la demanda, es necesario concluir que su acción no había prescrito.

Tal vez parezca demasiado largo ese período. Quizás si fuera aplicable la doctrina de "laches" a este asunto, habría motivos bastantes para estimar, como lo hizo la corte de distrito, que la negligencia de Alcaide por más de diez años era suficiente para destruir en equidad su acción, pero no tenemos el poder de modificar las leyes y estamos en el deber de aplicarlas tales como fueron aprobadas por la Legislatura.

Habiendo llegado a las anteriores conclusiones, esto es: a la de que la corte erró al decidir este caso haciendo aplicación al mismo de la doctrina de *estoppel* y a la de que la acción del demandante no ha prescrito ¿cuál debe ser la resolución del Tribunal Supremo? Si como parecía lógico, la corte sentenciadora, ya que se mostró convencida de ello, se hubiera limitado a la aplicación de la repetida doctrina de *estoppel*, sin entrar en el análisis de la prueba, un nuevo juicio se impondría como la única solución apropiada. Pero la corte fué más lejos, pesó la evidencia y resolvió la cuestión de la esterilidad en favor del demandante, y esto dificulta la solución del problema.

Sin embargo, como tenemos fuertes dudas de si la cuestión de la esterilidad del demandante ocupó suficientemente la atención de la corte, distraída como estaba por la cuestión del *estoppel,* creemos que los fines de la justicia exigen que se ordene la celebración de un nuevo juicio. En cuestiones de ciencia que dependen de opiniones, la prueba debe ser robusta y aunque podría decirse que el demandante mos-

tró un caso *prima facie* en su favor, sin embargo el hecho
de su esterilidad depende, en su último análisis, de la de-
claración del doctor Amadeo, y esa declaración no nos sati--
face enteramente, por lo menos en su forma, para derivar
como consecuencia necesaria de la orquitis doble que sufriera
su esterilidad absoluta. Las declaraciones de otros peritos,
o quizás la presentación de trabajos científicos, debieron ha-
berse acompañado. Verdad es que se trató de corroborar
la prueba suministrada por el doctor Amadeo con el alegado
análisis del semen del demandante hecho por el perito Pes-
quera, pero no estamos convencidos de que se estableció la
debida base para la presentación de esa prueba. En otras
palabras, no se demostró claramente en qué forma se obtuvo
el semen, o que no hubo ocasión de que se dañara, o que la
muestra suministrada a Pesquera fuera realmente de Alcaide.
El apelado no hizo la debida objeción, pero no estamos limi-
tados a las objeciones tales como fueren hechas por las par-
tes "sino que con el más alto fin de justicia, el tribunal puede
también entender en todos los hechos y tramitaciones en la
causa tal como aparecieren en autos, considerando en igual
forma sus méritos para la mejor administración de justicia
y del derecho, y evitar injusticias y demoras." Sección 1ª.
de la ley para transformar la Corte Suprema de Puerto Rico
en corte de apelación, aprobada en 12 de marzo de 1903,
página 58. Y los intereses de la justicia en este caso con-
creto están en contra de que se prive a la hija natural reco-
nocida de ser oída ampliamente antes de resolverse que no
es hija natural del hombre que como tal la reconociera, y
asimismo están dichos intereses en contra de que se resuelva
que Alcaide no debe tener un nuevo juicio cuando la declara-
ción hecha por la corte inferior con respecto a la esterilidad
del demandante lo fué enteramente en su favor. Un nuevo jui-
cio permitirá investigar con mayores datos más concienzuda-
mente el asunto y cualquiera que fuere la sentencia que se
dicte, lo será con mayores garantías de acierto.

No hemos perdido de vista que existe una ley (artículo 306 del Código de Enjuiciamiento Civil, tal como fué enmendado en 1906), que requiere que cuando se revoque la sentencia, orden o decreto del tribunal inferior esta corte proceda a pronunciar la sentencia, orden o decreto que debió haber dictado el tribunal inferior, salvo en los casos en que fuere necesario aclarar determinados puntos de hecho, o que la indemnización que hubiera de fijarse o materia sobre la cual hubiera que decretarse fuera dudosa, en cuyos casos debe devolverse la causa para su revisión al tribunal inferior. Leyes similares han sido interpretadas en el sentido de no oponerse, en casos propios, a la concesión de nuevos juicios. Véase 4 C. J. 1185 y 1193. Y esta misma corte ha seguido esa práctica entre otros en el caso de *Méndez v. Martínez,* 21 D. P. R. 252, 271. Además, es necesario adoptar tal medida porque ella ha sido el único medio por virtud del cual se ha podido llegar a una solución justa al par que viable, armonizando las varias opiniones de los jueces de esta corte surgidas con motivo del estudio y consideración de los méritos de este caso.

Debe revocarse la sentencia apelada devolviéndose el caso para la celebración de un nuevo juicio, con instrucciones a la corte de que resuelva las cuestiones planteadas de acuerdo con las alegaciones y las pruebas, sin consideración alguna a cual sea la opinión probable de esta corte sobre los méritos de las mismas.

> *Revocada la sentencia apelada y ordenada la*
> *celebración de un nuevo juicio.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y Aldrey.

El Juez Asociado Sr. Hutchison disintió.