RAMÓN G. ALMODÓVAR, demandante y recurrido, v. MARÍA MÉNDEZ ROMÁN, ETC., demandados y peticionarios.

Número: 0-84-544 Resuelto: 23 de enero de 1990

224

*Gilberto Figueroa Merced* y *Wilfredo Mercado Ramos,* abogados de los peticionarios; *Nelson Bassatt Álvarez,* abogado del recurrido.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

■ Hace más de dos décadas —mediante la decisión que emitiéramos en *Ocasio v. Díaz,* 88 D.P.R. 676 (1963)— sostuvimos el derecho de *todos* los hijos a la *absoluta igualdad de trato jurídico* a base de los postulados de igualdad y dignidad del ser humano dimanantes de nuestra Constitución y de las disposiciones de la Ley Núm. 17 de 20 de agosto de 1952 (31 L.P.R.A. sec. 441). Al así hacerlo, expresamos que carece "de validez toda disposición estatutaria y toda sentencia, decreto o fallo judicial que, en contravención con la letra de la Ley Núm. 17, únicamente le conceda, reconozca o atribuya al estado de hijo de un ser humano, nada más que parte de los derechos unitarios de que disfruta el hijo llamado legítimo".[1]

---

[1] *Ocasio v. Díaz,* 88 D.P.R. 676, 732 (1963).

■ Mediante la decisión que hoy emitimos en el presente recurso erradicamos el último vestigio de discrimen, inexplicablemente existente al día de hoy, en nuestro ordenamiento jurídico referente a los hijos no matrimoniales. Al revocar expresamente la norma jurisprudencial a los efectos de que un "padre" tiene el término de quince años para *impugnar el reconocimiento* que hubiere hecho de un "hijo" resolvemos que dicho término, por mandato expreso de nuestra Constitución y de otros preceptos legales aplicables, *no* puede ser diferente o distinto al término que le concede el Art. 117 del Código Civil de Puerto Rico(²) "al marido" para "impugnar la legitimidad del hijo . . .".

■ No debe haber duda alguna sobre el hecho de que en nuestro ordenamiento jurídico "las uniones ilícitas pueden y deben estar prohibidas" y que es nuestro deber "el desalentarlas. *Pero el fruto inocente de ellas debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas . . .".* (Énfasis suplido.)(³)

## I

El menor H.A.M. vino al mundo el día 23 de septiembre de 1979, fruto su concepción y nacimiento de unas alegadas relaciones amorosas ocurridas entre el demandante recurrido Ramón G. Almodóvar y la codemandada peticionaria María Méndez Román, quienes al momento del nacimiento del referido menor *no* eran casados entre sí.(⁴) El menor

---

(²) 31 L.P.R.A. sec. 465.

(³) Véase Informe de la Convención Constituyente encargada del estudio de la Carta de Derechos en lo relativo al alcance del término "nacimiento" contenido en el Art. II, Sec. 1 de la Constitución del Estado Libre Asociado, L.P.R.A. Tomo 1.

(⁴) De los autos no surge con claridad si al momento de la ocurrencia del nacimiento, el demandante recurrido Almodóvar estaba casado con otra dama. Sí surge que al momento en que éste radica la demanda de impugnación de reconocimiento estaba casado con otra persona.

H.A.M. fue *expresamente reconocido* como hijo por el recurrido Almodóvar, inscribiéndose dicho reconocimiento el día *1ro de octubre de 1979* en el Registro Demográfico, Oficina de Mayagüez, Puerto Rico.

El día *21 de octubre de 1983* el recurrido Ramón G. Almodóvar radicó ante el Tribunal Superior de Puerto Rico, Sala de Mayagüez, una demanda que intituló "Impugnación de Reconocimiento de Hijo (Nulidad de Reconocimiento)" en la cual alegó, en síntesis y en lo pertinente, que con posterioridad al mencionado reconocimiento "y luego de múltiples averiguaciones al entrar en dudas recientemente por razón de unas manifestaciones de la madre del menor, se ha comprobado que la parte demandante no es el padre de dicho menor", razón por la cual "la parte demandante interesa se anule el reconocimiento que de dicho niño hiciera eliminándosele así como padre natural de dicho niño". Apéndice C, pág. 7.

La parte demandada, compuesta por la Sra. María Méndez Román, por sí y en representación de su hijo H.A.M., prontamente radicó una moción de desestimación ante el tribunal de instancia en la cual alegó que, en vista de las disposiciones del antes citado Art. 117 del Código Civil de Puerto Rico y de lo resuelto por este Tribunal en *Santiago Ojeda v. Cruz Maldonado*, 109 D.P.R. 143 (1979),[5] la acción ejercitada por el demandante había caducado. Éste se opuso a la desestimación solicitada; alegó que su acción estaba predicada en lo resuelto por este Tribunal en *Alcaide v. Morales*, 28 D.P.R. 278 (1920) —y otras decisiones, inclusive posteriores al 1952, en que ratificamos lo resuelto en *Alcaide v. Morales*, ante— donde se estableció la norma de que la *acción de impugnación de reconocimiento* de un hijo natural

---

[5] En dicho caso se resolvió, en lo pertinente, que el término dispuesto por el referido Art. 117 del Código Civil, 31 L.P.R.A. sec. 465, era uno de caducidad y no de prescripción.

*prescribe a los quince años* por tratarse de una acción personal sin término fijo.

El foro de instancia, acogiendo como correcta la posición esgrimida por el demandante, declaró sin lugar la solicitud de desestimación radicada por la parte demandada. Inconforme, dicha parte acudió vía *certiorari* ante este Tribunal.

La parte demandada peticionaria alega, en síntesis, que la norma establecida en *Alcaide v. Morales*, ante, no puede sostenerse a la luz de lo dispuesto por la Sec. 1, Art. II, de nuestra Constitución, L.P.R.A., Tomo 1, la cual prohíbe todo discrimen por razón de nacimiento. El demandante recurrido, por su parte, argumenta que, siendo la acción para impugnar el reconocimiento de un hijo habido fuera de matrimonio distinta a la acción para impugnar la legitimidad del hijo habido mientras subsiste el matrimonio, esto es, contemplando ambas acciones situaciones diferentes, puede válidamente establecerse términos distintos para el ejercicio de ambas acciones sin que ello constituya una violación al citado precepto constitucional.

Habiendo expedido el auto de *certiorari* solicitado y estando en condiciones de resolver el mismo, procedemos a así hacerlo.

## II

■ La filiación, bien sea natural o por adopción, origina una serie de derechos y obligaciones entre los miembros de la familia. Esta da seguridad y publicidad al estado civil de la persona y como tal caracteriza su capacidad de obrar y el ámbito propio de su poder y responsabilidad. E. Serna Meroño, *La reforma de la filiación*, Madrid, Ed. Montecorvo, 1985, pág. 25; F. De Castro y Bravo, *Derecho Civil de España*, Madrid, Instituto de Estudios Políticos, 1952, T. II, pág. 70. En efecto, cabe señalar que de la filiación dependen varios estados civiles, que como tales, concretan la capacidad

e independencia de la persona. Manuel Peña y Bernaldo De Quirós nos explican lo anterior cuando exponen lo siguiente:

> . . . de ser hijo de tal o cual persona deriva que se tenga una u otra nacionalidad, o una u otra vecindad . . . cualidades éstas que deciden el régimen de los demás estados de la persona, ya que la capacidad y las relaciones familiares se rige[n] por la ley personal . . . aparte de la transcendencia que la determinación de la ley personal tiene en el régimen de otras materias (sucesiones, donaciones, obligaciones . . .). De la filiación depende *directamente* además la determinación de las personas que están legitimadas para provocar un cambio de estado civil (emancipación, adopción), o para promover judicialmente el cambio (por incapacitación). La filiación determina, también, las personas a quienes se está sujeto durante la minoría de edad (o en situación de patria potestad prorrogada). Influye la filiación en el poder de la persona: por la filiación se conoce si una persona tiene herederos forzosos, con la consiguiente trascendencia en relación con la potestad de donar . . . o de disponer "mortis causa" . . . o, en general, con la potestad de gestión del propio patrimonio (por la posible declaración de prodigalidad . . .). M. Peña y B. De Quirós, *De la paternidad y filiación*, en M. Amorós Guardiola, *Comentarios a las reformas del derecho de familia*, Madrid, Ed. Tecnos, 1984, Vol. I, pág. 795.

Con certeza, a renglón seguido, los citados autores concluyen que:

> La filiación es un estado civil *familiar*, un "status familiae": la filiación, sea matrimonial o no matrimonial, concreta la situación de cada persona dentro de la organización de la respectiva familia, con los consiguientes poderes y deberes (apellidos, alimentos, derechos sucesorios, funciones tuitivas, derechos y deberes de los herederos forzosos), incompatibilidades (para actuar como juez, árbitro, perito, testigo, "intervivos" o en testamentos, notario, registrador), prohibiciones (impedimento de parentesco para el matrimonio) y trascendencia penal en la tipificación de los delitos o en la medida de las penas. Como estado familiar tiene efectos correlativos —no siempre del mismo alcance— con los demás miembros de

la familia y, en primer lugar, con los padres: la condición de hijo se corresponde con la de padre o madre que también son estados civiles. Peña y De Quirós, *op. cit.*, págs. 795-796.

 Ciertamente la Constitución de Puerto Rico prohíbe el discrimen por razón de nacimiento y proclama el principio de igualdad de los hombres ante la ley. Nuestras leyes, cónsonas con este mandato constitucional, han establecido la igualdad de trato para todos los hijos con respecto a sus padres. Ley Núm. 17 de 20 de agosto de 1952, ante. Debe mantenerse presente, sin embargo, que la prohibición de todo discrimen por cualquier circunstancia personal o social, no implica la exclusión de cualquier diferenciación entre las personas por su condición sino aquellas que carecen de justificación objetiva. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975).

 En la filiación la equiparación se produce en cuanto a los efectos *del estado de hijo*. Es decir, sea hijo matrimonial o no matrimonial, nuestro ordenamiento atribuye los mismos derechos, facultades, obligaciones, deberes, incompatibilidades y prohibiciones dentro de la organización de la familia y la sociedad. Constituye una realidad, sin embargo, que nuestro vigente Código Civil regula de modo distinto la determinación oficial de la filiación, así como las acciones de reclamación e impugnación de la misma, al clasificar a los hijos en legítimos, 31 L.P.R.A. sec. 461; legitimados, 31 L.P.R.A. sec. 481, y naturales, 31 L.P.R.A. sec. 501.[6]

--------

[6] En los últimos treinta años, diversas jurisdicciones han suprimido la tradicional distinción entre filiación legítima e ilegítima, sustituyéndola por el principio de la unidad de filiación.

Quizás la vanguardia corresponde a los países escandinavos: Noruega (leyes de 1956 y 1981), Dinamarca (ley de 1960) y Suecia (ley de 1969). Pero no pueden dejar de mencionarse, en Europa occidental, las reformas al derecho de filiación que en 1969 se producen en Alemania Federal, Holanda y Gran Bretaña; en 1970, en Austria; en 1975, en Italia; en 1976, en Suiza; en 1977 en Portugal, y en 1981 en

Como sabemos el principio básico o *conditio iuris* de la filiación natural es la procreación o generación física. A. Pérez Fernández, *Ideas generales en torno al nuevo régimen de la filiación* en Anales de la Academia Matritense del Notariado, Madrid, Ed. Rev. Der. Privado, 1982, T. XXV, pág. 435. La procreación es de fácil determinación respecto de la madre, probado el hecho del parto y la identidad del hijo, 31 L.P.R.A. sec. 504. La identidad del padre, sin embargo, no es de tan sencilla solución. Coexisten dos situaciones: la del hijo cobijado por una presunción de legitimidad, por haber nacido éste "vigente" el matrimonio, y la del hijo no matrimonial.

La filiación es legítima (matrimonial) cuando el padre y la madre del niño están casados entre sí. El Art. 113 del Código Civil, 31 L.P.R.A. sec. 461, establece una presunción de "legitimidad" para aquellos hijos nacidos después de los ciento ochenta días siguientes a la celebración del matrimonio y dentro de los trescientos días siguientes a la disolución del mismo. Son diversas las teorías que se han esbozado en torno al fundamento de esta presunción. Véanse: *Ramos v. Marrero*, 116 D.P.R. 357 (1985); *Moreno Álamo v. Moreno Jiménez*, 112 D.P.R. 376 (1982).

La doctrina española ha reiterado que la presunción *pater is est quem iustae nuptiae demonstrant* "'representa la primacía de lo social sobre lo biológico en Derecho'", primacía justificada hoy por la constelación de fines que la familia legítima satisface: "'la idea patrimonial, la idea del respeto a

---

España. Deben mencionarse las leyes de algunos estados norteamericanos (*v.gr.*, Arizona, 1956; North Dakota y Oregon, 1963); los códigos de la familia de los países socialistas de Europa (Hungría, leyes de 1946 y 1974; Checoslovaquia, 1963; Polonia, 1964; República Democrática Alemana, 1965; Bulgaria, 1968), y algunos países de Sur América, como Bolivia (Código de la Familia de 1972) y Cuba (Código de la Familia de 1975), Venezuela (Código Civil reformado en 1982) y Ecuador (Código Civil de 1980).

las decisiones privadas, aspectos económicos y de higiene social, efecto estabilizador de reservas íntimas de responsabilidad; todo esto basta para fundamentar semejante principio de un modo independiente'". J. Puig Brutau, *Fundamentos de derecho civil*, Barcelona, Ed. Bosch, 1970, T. IV, Vol. II, págs. 10–11; D. Espín Cánovas, *Manual de derecho civil español*, 3ra ed., T. IV, pág. 264; J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Derecho de familia*, Barcelona, Ed. Bosch, 1978, pág. 367; R.F. Bonet, *Compendio de derecho civil*, Madrid, Ed. Rev. Der. Privado, 1960, T. IV, pág. 518; C. Grossman, *Acción de impugnación de paternidad del marido*, Buenos Aires, Ed. Abaco, 1982.

 Es indudable que se sigue valorando la familia matrimonial como régimen socialmente más deseable. Peña y Quirós, *op. cit.*, pág. 786. En este sentido, la presunción *pater is est quem iustae nuptiae demonstrant* tiene razón de ser solamente dentro de un marco que propulsa el concepto de "legitimidad" como una protección a la institución del matrimonio. A. Calderón, *La filiación en Puerto Rico*, 2da ed., San Juan, Ed. C. Abo. P.R., 1978, pág. 174. A estos efectos Serna Meroño señala que "el matrimonio tiene 'significado de fundamento de la familia, institución ésta a la que los poderes públicos deben protección jurídica', y no puede ignorarse que, en principio, el matrimonio confiere certeza en la paternidad, lo cual va a incidir de manera directa sobre el régimen de las acciones, 'haciendo más fácil la reclamación de una filiación matrimonial y más difícil su impugnación'". Calderón, *op. cit.*, pág. 184.

### III

 Por otro lado, se ha señalado que "[l]as personas que carecen de filiación conocida paterna o materna o de ambas, pasan a ostentar una u otra o las dos cuando los reconoce un varón, una mujer o una pareja". M. Albaladejo,

*Curso de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1984, T. IV, pág. 226. Así, el reconocimiento es el medio más importante para determinar la filiación no matrimonial. En cuanto a los caracteres del reconocimiento hay, en términos generales, consenso al respecto. Los mismos han sido usualmente enumerados y explicados de la manera siguiente:

1.º Ser un *acto individual*, puesto que sólo podía conocerse la identidad de la persona que lo efectuaba y no la del otro progenitor (art. 132).

2.º Por ser un *acto personalísimo*, que debía ser realizado por el padre o la madre. No obstante, *CASTÁN* estimaba que no había inconveniente legal en admitir un reconocimiento por medio de mandatario, con poder especial formalizado en documento público. Otros, por el contrario, negaban esta posibilidad.

3.º Ser un *acto unilateral*, y así era admitido de manera generalizada, aunque, debido a que en el art. 133 del Código se preveía que para el caso en que el reconocimiento recayera sobre un mayor de edad se requería su consentimiento, hac[í]a pensar que el reconocimiento tenía carácter bilateral; sin embargo, en opinión de ALBALADEJO, el consentimiento del mayor era un presupuesto de eficacia, una *conditio iuris*, pero que no tenía por ello el reconocimiento carácter bilateral.

4.º Ser un *acto formal*. El art. 131 establecía los medios por los que se podía hacer el reconocimiento. De lo cual se desprendía que el reconocimiento debía ser *expreso*, aunque, según ROYO MARTÍNEZ, también podía exteriorizarse por medio de una conducta expresiva y perseverante. Además de ser expreso, el reconocimiento era un *acto solemne*, siendo admitido como tal por la doctrina.

5.º Ser un *acto puro*, en el sentido de no admitir estar sometido a condición, término o modo.

6.º Ser también un *acto irrevocable*, aunque se hiciera en actos que pudieran ser revocados, como era en el supuesto de hacerse en testamento, pues de manera expresa declaraba el artículo 741 que el reconocimiento seguía siendo válido aunque se revocara el testamento. Sin embargo, la irrevocabilidad del reconocimiento no impedía la posibilidad de poder impugnar. (Énfasis en el original y escolios omitidos.) Serna Me-

roño, *op. cit.*, págs. 56–57. Véanse, en adición: R. Herrera Campos, *La filiación no matrimonial tras la reforma del Código Civil de 13 de mayo de 1981*, Rev. Der. Privado 1–13 (enero—junio 1983); C.E. Mascareñas, *La filiación en el Derecho puertorriqueño*, 4 Rev. Der. Pur. 7, 14 (1962).

Pero si bien el reconocimiento goza de cierta uniformidad en la discusión doctrinaria de sus rasgos particulares, no ha sido así en cuanto a su contenido y naturaleza jurídica. En cuanto a su contenido la doctrina sostuvo dos posiciones. Esto es, "[p]ara la primera, el reconocimiento llevaba consigo una confesión de paternidad; así la filiación quedaba establecida por la convicción o creencia de paternidad que había sido exteriorizada por el padre de alguna forma. Para la segunda, era preciso que hubiera por parte del padre voluntad de reconocer y sólo quedaba establecida la filiación cuando constaba la decisión o voluntad de tener al reconocido por hijo y cumplir respecto al mismo los deberes correspondientes a la posición jurídica de padre natural". Serna Meroño, *op. cit.*, pág. 54.

Esta polémica sobre el contenido del reconocimiento se extendía al plantearse la naturaleza jurídica del mismo. Varias teorías trataban de explicar la cuestión. Así, había una corriente doctrinaria que configuraba el reconocimiento como un negocio jurídico. D. De Buen, *Notas sobre el Derecho español*, en A. Colin y H. Capitant, *Curso Elemental de Derecho Civil*, 3ra ed., Madrid, Ed. Reus, 1952, T. I, pág. 649; B. Pérez González y J. Castán Tobeñas, *Notas sobre el Derecho español*, en L. Enneccerus, *Tratado de Derecho Civil*, 6ta rev. de la 20ma ed. alemana, Barcelona, Ed. Bosch, 1946, T. IV, Vol. 2, pág. 210; L. Díez-Picazo y Ponce de León, *El negocio jurídico del derecho de familia*, 212 (Núm. 3) Rev. Gen. Leg. Jur. 771, 774 (1962). Otro sector lo consideraba como un acto jurídico en sentido estricto, pues sus efectos se producen *ex lege* y no *ex voluntate*. Albaladejo, *op. cit.*, pág. 227; M. De la Cámara Álvarez, *Reflexiones sobre la fi-*

*liación ilegítima en derecho español*, Madrid, Ed. Tecnos, 1975, pág. 49. En España, luego de la promulgación de la Constitución de 1978 y de la reforma de la filiación lograda en 1981, esta es la postura adoptada. X. O'Callaghan Muñoz, *Compendio de Derecho Civil: derecho de familia*, Madrid, Ed. Rev. Der. Privado, 1982, T. IV, pág. 253; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, Madrid, Ed. Tecnos, 1982, Vol. IV, págs. 331–332.

Cónsono con esta tendencia doctrinaria, Albaladejo sostiene que el reconocimiento "es un acto por el que el que lo realiza *se declara* padre (o madre, lo que, en adelante, se sobreentiende) del hijo de que se trata. Esencialmente consiste, pues, *sólo*, en una pura y simple afirmación de paternidad o maternidad biológica. Ese es su contenido *necesario*, pero también *suficiente*". (Énfasis en el original.) Albaladejo, *op. cit.*, pág. 227. Esta tesis es compartida por varios autores, aunque con ciertos matices. Así, hay quien afirma que el reconocimiento puede definirse como el acto jurídico de Derecho de Familia, en cuya virtud se declara o admite el hecho de la paternidad o maternidad y se asumen o admiten las consecuencias legales inherentes a la misma. J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. IV, págs. 647–648. Otros sostienen que es un acto individual, no negocial, por el que se determina legalmente una filiación no matrimonial, a base de la convicción de la maternidad o a la creencia de la paternidad biológica, con la producción *ex lege* de los efectos derivados del estado civil así determinado. V.M. Garrido de Palma, *El reconocimiento de hijos*, en Anales de la Academia Matritense del Notariado, Madrid, Ed. Rev. Der. Privado, 1982, T. XXV, pág. 20; De la Cámara Álvarez, *op. cit.*, págs. 56–58 esc. 72.

▮ Díez-Picazo, con anterioridad a la reforma española, sostenía que el reconocimiento de los hijos naturales

era una declaración de voluntad constitutiva de un negocio jurídico de Derecho de Familia, porque la ley otorgaba a la voluntad individual fuerza suficiente para configurar los efectos jurídicos y para crear una nueva situación jurídica, transformando la anterior. Después de la reforma este autor, *siguiendo el pensamiento mayoritario*, considera que ya no es la voluntad del reconocedor la que produce unos u otros efectos jurídicos, ni tampoco la creación de una nueva situación jurídica. Afirma, por el contrario, que esta circunstancia se produce en virtud de un hecho natural, la procreación, existiendo una relación jurídica suficiente entre el progenitor y el hijo. Díez-Picazo y Gullón, *op. cit.*, pág. 317. *En síntesis*, podríamos afirmar que "[e]l reconocimiento en la actualidad no cumple, pues, otra función que la de determinar la filiación, y para esta finalidad no es necesario un negocio jurídico ni una voluntad negocial. La creación de la relación de filiación es ahora obra de la ley, no de los particulares, que no pueden disponer de los efectos jurídicos". Serna Meroño, *op. cit.*, pág. 240.

Como hemos visto hasta el momento, nuestro ordenamiento no equipara la filiación matrimonial y la no matrimonial. La primera se basa en la presunción *pater is est quem iustae nuptiae demonstrant* protegiendo indudablemente la relación matrimonial existente. La segunda requiere del acto jurídico mediante el cual una persona se declara madre o padre del hijo de que se trate. Para que ocurra una equiparación en cuanto a este particular se requeriría "sustituir la presunción de paternidad matrimonial del marido de la madre por el reconocimiento, por parte del mismo, de cada uno de los hijos que alumbrase su mujer". J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Derecho de Familia*, Barcelona, Ed. Bosch, 1982, pág. 604 n. 1. Bossert enfatiza que "[s]emejante equiparación resultaría aberrante al principio que sostiene la presunción de la paternidad del marido,

amén de que importaría un disloque a la estabilidad de las relaciones familiares". (Escolio omitido.) G.A. Bossert, *Régimen legal de filiación y patria potestad: Ley 23.264*, 2da ed., Buenos Aires, Ed. Astrea, 1987, pág. 22.

## IV

En adición a la diferencia en el tratamiento que nuestro ordenamiento establece entre la filiación matrimonial y la no matrimonial, debemos, además, considerar lo que se ha denominado "acciones de estado", las cuales son consecuencia directa de esa diferencia en el tratamiento. Estas son aquellas que "tienden a declarar la existencia de los presupuestos de un determinado emplazamiento o el estado de familia, o a constituir, modificar o extinguir un emplazamiento". Bossert, *op. cit.*, pág. 87; E.A. Zannoni, *Derecho de Familia*, Buenos Aires, Ed. Astrea, 1978, pág. 57. Entonces, se reconoce la posibilidad que tienen los interesados en una filiación en particular, de promover la averiguación de la verdadera, para que conste legalmente, y de promover el ataque a la que conste legalmente cuando no sea la verdadera. Albaladejo, *op. cit.*, pág. 247. Estas acciones son divididas en "reclamación de filiación" e "impugnación de filiación". Íd. Es innecesario que nos ocupemos de la reclamación de filiación. Nuestras decisiones sobre el particular son claras. *Pol Sella v. Lugo Christian*, 107 D.P.R. 540 (1978); *Diez Rodríguez v. Guzmán Ruiz*, 108 D.P.R. 371 (1979). No ocurre así cuando nos enfrentamos a la impugnación de la filiación.

Debemos señalar que la doctrina suele hablar de impugnación de paternidad refiriéndose a la filiación matrimonial, única filiación presumida. Como señala Bossert, *op. cit.*, págs. 22–23, "la impugnación de la paternidad sólo es posible cuando, presumiendo la ley esa paternidad, el marido ataca la presunción. No hay acción de impugnación de la paternidad extramatrimonial, aunque pueda existir la acción

de impugnación del reconocimiento". A su vez esta impugnación de la paternidad del marido ha sido clasificada y distinguida por la doctrina en impugnación o desconocimiento riguroso de la paternidad y la denominada impugnación, o desconocimiento simple de ella. Bossert, *op. cit.*, pág. 156; M. De la Cámara Álvarez, *El nuevo derecho de la filiación*, en D. Espín Cánovas, *El nuevo derecho de familia español*, Madrid, Ed. Reus, 1982, pág. 49. Bástenos con decir que en la primera corresponde al marido atacar la presunción legal produciendo prueba que descarte el nexo biológico. En la segunda, ha de negar la filiación probando que el hijo de su mujer nació en los primeros ciento ochenta días del matrimonio, o después de los trescientos días de la disolución del matrimonio. Bossert, *op. cit.*, pág. 157.

▮ Por otra parte, mucho más compleja resulta ser la disciplina de la *impugnación del reconocimiento*. Según Bossert, históricamente la doctrina ha distinguido entre la acción de nulidad del reconocimiento y la de impugnación del mismo. Bossert, *op. cit.*, pág. 245; M. Albaladejo, *El reconocimiento de la filiación natural*, Barcelona, Ed. Bosch, 1954, pág. 208 y ss. La primera hace inexistente el acto del reconocimiento al faltar algún requisito que impide la eficacia del acto jurídico. Bossert, *op. cit.*, pág. 247. Así, faltará un requisito de eficacia si falta, por ejemplo, "el consentimiento del reconocido, o la aprobación judicial o el consentimiento del representante legal, o el consentimiento de los descendientes del reconocido ya fallecido. Tampoco es eficaz el reconocimiento si está en oposición con un título de legitimación anterior que acredite una filiación contradictoria". Peña y De quirós, *op. cit.*, pág. 936. *En cambio*, la acción de impugnación de reconocimiento, *stricto sensu*, "ataca o controvierte su *contenido*, o, lo que es lo mismo, *controvierte el presupuesto biológico que lo implica*: el nexo biológico de-

terminado por la procreación entre reconociente y reconocido". (Énfasis en el original.) Bossert, *op. cit.*, pág. 245.

La doctrina española, luego de la reforma de 1981, sostiene que se trata de una sola acción de impugnación del reconocimiento que tiene como base el vicio en el consentimiento prestado y la cual procede cuando el impugnador demuestra a satisfacción del tribunal que actuó movido por error o debido a violencia o intimidación, siendo inmaterial el hecho de si el reconocido es o no hijo del impugnador. En palabras de Albaladejo:

> Huelga insistir en que queda por completo al margen la cuestión de si el reconocido es o no hijo del reconocedor. No se trata de demostrar que con violencia o intimidación se obligó a reconocer a un no hijo. Se trata simplemente de que, demostrando que se reconoció intimidado o violentado, prosperará la impugnación del reconocimiento, sin tener que referirse para nada al asunto de la filiación del reconocido. Y lo mismo cabe decir del error. Por supuesto que quien demuestra que reconoció al hijo por creerlo suyo, y no lo es, prueba su error, pero prueba también la no paternidad, prueba ésta que bastaría por sí sola. Mas, no es esta prueba la que se exige en el caso de error en el reconocimiento. El error aquí no exige probar que no se es padre, sino que, se lo sea o no (cosa en la que no se entra), se reconoció por haber padecido un error que, según las reglas generales, habrá de haber sido esencial, es decir, de tal índole que sin él no se habría reconocido . . . .[7]

En nuestra jurisdicción, la controversia de si el reconociente puede impugnar el reconocimiento fue resuelta desde principios de siglo. En aquel momento admitimos que un reconocimiento era irrevocable, pues no es dado dejar al arbitrio de las personas el estado civil de un hijo, pero sostuvimos que podía impugnarse y anularse el reconocimiento mediante sentencia judicial. Así, en *Alcaide v. Morales*, ante,

---

[7] M. Albaladejo, *Curso de Derecho Civil*, 2da ed., Barcelona, Ed. Bosh, 1984, T. IV, pág. 263.

pág. 291, aceptamos que existe la acción para pedir la anulación del reconocimiento voluntario hecho por el padre, siempre que éste tenga pruebas evidentes para así demostrarlo. En este caso expresamos que:

> Puede concebirse que concurran circunstancias tales que reclamen la intervención y la acción de las cortes para anular el reconocimiento no obstante haber procedido voluntariamente el padre en el momento en que lo hizo. Además, si bien no existe precepto de ley alguno que directamente regule la cuestión, las disposiciones del legislador en relación con los hijos legítimos, indican su criterio en el sentido de la existencia de la acción. Nos referimos a los artículos 181, 182, 183, 184 y 185 del Código Civil Revisado. Claro es que la prueba que se aporte tiene que ser de tal manera robusta y convincente que al anular el reconocimiento voluntario hecho la corte quede plenamente convencida de que esa y no otra es la resolución que impone la justicia.[8]

El hecho de la existencia en nuestro ordenamiento de la acción de impugnación del reconocimiento voluntario —y la procedencia jurídica de la misma— es una cuestión que no amerita mayores comentarios. *Dados los planteamientos de las partes, lo que debemos resolver en el presente recurso es si la norma que establecimos hace casi siete décadas en Alcaide v. Morales, ante —respecto al plazo para radicar la referida acción de impugnación del reconocimiento— debe o no permanecer inalterada.*

## V

En el citado caso de *Alcaide v. Morales*, luego de reconocer la existencia y procedencia en nuestro ordena-

---

(8) Merece destacarse el hecho de que en el caso de *Alcaide v. Morales*, 28 D.P.R. 278 (1920), se trataba de una acción de impugnación del reconocimiento en el cual el vicio del consentimiento alegado lo era el "error", basado el mismo en que, luego de efectuado el reconocimiento, el demandante había advenido en conocimiento de que él no podía procrear hijos por ser estéril.

miento de la acción de impugnación del reconocimiento, razonamos que para radicar la misma el "impugnador" tenía el término de quince años por cuanto, tratándose de una acción personal que no tiene término de prescripción señalado, le eran aplicables a la misma las disposiciones del Art. 1864 del vigente Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5294.(9)

Independientemente del planteamiento, u objeción, constitucional que respecto a la referida norma jurisprudencial esboza la parte demandada peticionaria en el presente recurso, *somos del criterio que la misma no debe subsistir.* En primer lugar, y como reconociéramos en el propio caso de *Alcaide v. Morales,* ante,(10) el mencionado término de quince años es uno irrazonablemente largo. En el mundo moderno de adelantos en los campos de la ciencia y la comunicación en que hoy día vivimos, realmente *no* existe justificación alguna para mantener en una incertidumbre, o limbo jurídico, el "estado de hijo" de una persona que fue expresamente reconocida por el "padre" por tan largo período de tiempo. Por otro lado, el término de quince años que establece el citado Art. 1864 del Código Civil es uno de prescripción y, como sabemos, resulta ser jurídicamente improcedente la aplicación de un término de prescripción a una situación que reclama y exige la aplicación de uno de caducidad. Véase, en general, W. Cortés Burgos, *El problema de la caducidad en la filiación,* 86 Rev. Der. Pur. 185 (1982–1983); E. Vázquez Bote, *En torno a los problemas filiatorios en el*

---

(9) Como expresáramos al comienzo de la ponencia, la norma jurisprudencial antes mencionada fue ratificada por este Tribunal en varias ocasiones posteriores, inclusive luego del advenimiento de la Constitución del Estado Libre Asociado de Puerto Rico en el año de 1952. Véanse: *Collazo v. Mouriño,* 51 D.P.R. 728, 731 (1937); *F. Rodríguez Hnos. & Co. v. Aboy,* 66 D.P.R. 525, 540 (1946); *Rossy v. Martínez,* 70 D.P.R. 737, 741 (1949); *Rivera v. Rivera,* 78 D.P.R. 908, 911 (1956); *Ríos v. Banco Popular,* 81 D.P.R. 378, 407 (1959), opinión concurrente del Juez Asociado Señor Santana Becerra.

(10) *Alcaide v. Morales,* ante, pág. 294.

*Derecho puertorriqueño*, 45 Rev. Der. Pur. 127 (1972); G. Velázquez, *La extinción de la acción de filiación en el derecho puertorriqueño*, XVII (Núm. 4) Rev. C. Abo. P.R. 237, 245 (1957); J. Castán Tobeñas, *Derecho Civil español, común y foral*, Madrid, Ed. Reus, 1952, T. I, Vol. 2, págs. 675–676.

Como certeramente expresáramos —citando con aprobación al Profesor Guaroa Velázquez—([11]) en *Ortiz Rivera v. Sucn. González Martínez*, 93 D.P.R. 562, 589 (1966):

"La prescripción no es una institución aplicable al derecho de familia, ya que la ley la configura para aplicarla solamente a la esfera del derecho privado (patrimonial) estableciéndola para proteger intereses individuales de que el particular pueda disponer; por tanto, no pueden estar sujetos a prescripción los derechos que están fuera del comercio y no son susceptibles de disponibilidad por los particulares, entre los cuales derechos figuran los de filiación. Como dicen A. Colin y H. Capitant: 'La prescripción es una forma de renuncia. Los derechos que no se pueden enajenar, no pueden tampoco prescribir.'"

Sin entrar, repetimos, en la discusión del planteamiento constitucional que se nos hace, no hay duda de que en lugar del término antes mencionado de quince años que establece el citado Art. 1864 del Código Civil, parecería ser mucho más apropiado y aplicable a la situación ante nuestra consideración el plazo de cuatro años que establece el Art. 1253 del referido Código Civil, 31 L.P.R.A. sec. 3512,([12]) el cual regula

---

([11]) G. Velázquez, *La extensión de la acción de filiación en el derecho puertorriqueño*, XVII (Núm. 4) Rev. C. Abo. P.R. 237 (1957).

([12]) Dispone el Art. 1253 del Código Civil, 31 L.P.R.A. sec. 3512:

"La acción de nulidad sólo durará cuatro (4) años.

"Este tiempo empezará a correr:

"En los casos de intimidación o violencia, desde el día que éstas hubiesen cesado;

"en los de error, o dolo, o falsedad de la causa, desde la consumación del contrato;

la acción de nulidad de los contratos debido a error, violencia, intimidación, etc. —M. Royo Martínez y J.L. Lacruz Berdejo, *Derecho de Familia*, Barcelona, Ed. Bosch, 1966, pág. 396; J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, págs. 321–323; Albaladejo, *El reconocimiento de la filiación natural, op. cit.*, pág. 217— o el "plazo" dispuesto por el citado Art. 117 del Código Civil, el cual regula una situación similar.

Ello, sin embargo, no resuelve la problemática ante nuestra consideración. En vista de lo planteado por la parte demandada peticionaria, realmente no podemos limitarnos meramente a determinar cuál de los dos antes mencionados plazos es el más apropiado. Resulta obligatorio que nos enfrentemos a, y resolvamos, el planteamiento de si las disposiciones de las Secs. 1 y 7 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y la de otros preceptos legales aplicables, hacen mandatorio el fijar o señalar un *único* plazo tanto para la radicación de la acción de impugnación del reconocimiento como para la radicación de la acción de impugnación de legitimidad.

La contestación a dicho planteamiento conlleva, naturalmente, la evaluación y discusión de si nos enfrentamos a una de tres posibles situaciones: (1) dos grupos de personas completamente distintos, lo cual permite que se regulen los mismos de manera diferente; (2) aun cuando estemos ante personas comprendidas dentro de un mismo grupo "protegido", nos encontramos ante una situación de un trato desigual justificado por razón de la existencia de un

---

"cuando la acción se dirija a invalidar contratos hechos por mujer casada, sin licencia o autorización competente, desde el día de la disolución del matrimonio,

"y cuando se refiera a los contratos celebrados por los menores o incapacitados, desde que salieren de tutela."

"interés apremiante"; (3) o, por último, no existiendo tal "interés", la "clasificación" que se pretende hacer dentro de dicho grupo resulta ser constitucionalmente impermisible.[13] *Pueblo v. Matías Castro*, 90 D.P.R. 528 (1964); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667 (1978); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248 (1980).

## VI

Como expresáramos al comienzo de la ponencia, el demandante recurrido sostiene que siendo las acciones para impugnar el reconocimiento y para impugnar la legitimidad acciones distintas, y contemplando las mismas situaciones diferentes, resulta constitucionalmente permisible establecer téminos distintos para el ejercicio de ambas acciones. No le asiste la razón; veamos por qué.

■ No hay duda de que el ser humano que nace de madre casada adquiere desde el momento mismo de su nacimiento, respecto al marido de su madre, la "condición o estado de hijo" de aquél por mandato expreso de las disposiciones del Art. 113 del Código Civil, ante.[14] Esa presunción "de legitimidad" —o, conforme al estado de derecho vigente en nuestra jurisdicción, la presunción de que se es hijo de esa persona en particular— que establece el mencionado precepto legal tiene su base, o razón de ser, precisamente en la relación jurídica existente entre el marido y su esposa.

---

[13] Como explicaremos más adelante, si bien es cierto que el análisis constitucional bajo la cláusula de la igual protección de las leyes se ha aplicado tradicionalmente en el contexto de *clasificaciones legislativas*, es igualmente aplicable en el contexto de *clasificaciones jurisprudenciales*, ya que los derechos constitucionales se reclaman contra el Estado y la Rama Judicial es uno de sus componentes. Además, las Opiniones de este Tribunal son "ley" en esta jurisdicción al igual que las aprobadas por la Asamblea Legislativa.

[14] 31 L.P.R.A. sec. 461.

El hijo de mujer no casada, por el contrario, nace sin filiación respecto a padre alguno por razón, naturalmente, de la inexistencia de una persona que pueda ser presuntivamente señalada como padre por la ley. Este adquiere el "estado o condición de hijo", *entre otras y en lo pertinente*, cuando el padre en forma afirmativa lo reconoce como tal.[15]

Con motivo de lo antes señalado, la evidencia a ser presentada en la acción de impugnación de legitimidad por necesidad no puede ser exactamente igual a la de la acción de impugnación del reconocimiento. La presunción de "legitimidad" —o, lo que es lo mismo, de que se es hijo de determinada persona— que por ley cobija al hijo matrimonial *necesariamente obliga* al padre (marido) que interesa y decide impugnar esa "condición de hijo" a presentar, en la referida acción de impugnación, evidencia que demuestre que él no es el "padre" de ese "hijo". Esto es, en esta acción se ataca directamente la relación biológica de hijo.[16]

Aun cuando el efecto o consecuencia final es el mismo, esto es, la aniquilación del estado filiatorio,[17] en el caso de la acción de impugnación del reconocimiento por el,

---

[15] "El reconocimiento puede ser definido como acto jurídico consistente en la afirmación solemne de la paternidad biológica hecha por el generante, acto . . . que lo liga con el reconocedor." M. Albaladejo, *El reconocimiento de la filiación natural*, Barcelona, Ed. Bosch, 1954, pág. 53.

[16] Ello éste lo logra o demuestra, entre otros, probando que él no tuvo acceso carnal a la esposa durante el período de concepción del hijo por razón, a manera de ejemplo, de que se encontraba fuera del país; que pudiendo tener ese acceso carnal, él padece de una condición de impotencia o esterilidad que impide la procreación; que aun habiendo tenido contacto sexual con la esposa durante ese período de concepción, pruebas científicas confiables lo excluyen como padre; etc. En otras palabras, la única manera en que el marido puede destruir esa "condición de hijo" que le confiere la ley al ser nacido vigente el matrimonio lo es mediante la presentación de prueba que destruya la relación biológica entre él y ese "hijo".

[17] En palabras del profesor Calderón, Hijo: "El propósito y la consecuencia de la impugnación es, pues, el derrumbamiento del estado filiatorio establecido." Á.R. Calderón, Jr., *La Filiación en Puerto Rico*, 2da ed., San Juan, Ed. C. Abo. P.R., 1978, pág. 35.

contrario, no resulta necesario impugnar la condición de hijo en forma directa. La acción afirmativa del reconocimiento *presupone un acto voluntario e informado*. Es debido a ello que, como hemos visto anteriormente, se ha aceptado por la doctrina y los tribunales de justicia que ese reconocimiento puede ser impugnado a base de que hubo *vicio en el consentimiento prestado por razón de error, violencia o intimidación*; esto es, que el mismo se prestó de manera involuntaria o, si voluntariamente, "mal informado". Esa es la razón por la cual, como correctamente nos señala Albaladejo, en una acción de impugnación de reconocimiento "queda por completo al margen la cuestión si el reconocido es o no hijo del reconocedor".(18) Dicho de otra forma, en una acción de impugnación del reconocimiento lo que se impugna, o se pretende anular, es el acto en sí del reconocimiento. Para ello no es necesario traer prueba que destruya la relación biológica de padre e hijo. Todo lo que se requiere es demostrar que el consentimiento prestado fue uno viciado por razón de la existencia de violencia, intimidación o error.(19)

Debe quedar meridianamente claro, sin embargo, que nada de lo anteriormente señalado significa que se trata de dos grupos distintos de personas. Lo que sucede es que dependiendo del hecho de si se nace de madre casada

---

(18) Albaladejo, *Curso de Derecho Civil, op. cit.*, pág. 263.

(19) Ello claramente se percibe en los casos en que se impugna el reconocimiento debido a violencia o intimidación: el consentimiento se prestó debido a que el reconociente fue objeto de violencia o éste tenía el temor fundado de ser víctima de ella. En el caso del error es exactamente la misma situación; esto es, lo que se pretende impugnar es el reconocimiento y no la relación biológica propiamente. Resulta un tanto difícil visualizarlo por razón de que, de ordinario, en esta situación se presenta prueba que destruye la relación biológica. Por ejemplo, se trae prueba de que se descubrió que el "padre" era estéril o que los exámenes de sangre lo excluyen como tal. Su propósito, sin embargo, no es demostrar que el reconociente no es el padre. El mismo es demostrar que éste reconoció por error; esto es, si éste hubiera sabido que era estéril, no hubiera prestado el consentimiento para reconocerlo.

o soltera —circunstancia sobre la cual el hijo no tiene control alguno— *existe una diferencia inevitable en la forma y manera en que se adquiere la "condición o estado de hijo".* Como hemos visto, unos la adquieren desde el *momento mismo del nacimiento* y otros la adquieren desde el *momento del reconocimiento.* Ahora bien, una vez dicha condición se adquiere, *se trata de un mismo y único grupo de personas: hijos.* Como expresara el Tribunal Supremo de España, en su Sentencia de 25 de junio de 1909, pág. 498, "el reconocimiento que de su hijo hace un padre natural *produce análogos efectos* a la presunción de legitimidad de los hijos habidos de matrimonio legalmente celebrado . . .". (Énfasis suplido.) *En otras palabras, así como la presunción que establece el citado Art. 113 del Código Civil, consiste en suponerlos hijos del marido, la presunción que del reconocimiento se deriva es la de suponerlos hijos del reconocedor.*

## VII

 Una vez se ha adquirido el estado o condición de hijo, esto es, *se es hijo* —ya desde el momento del nacimiento en el caso del hijo de mujer casada, ya desde el momento del reconocimiento en el caso del hijo de mujer soltera— por mandato expreso de nuestra Constitución ningún hijo puede injustificadamente ser víctima de discrimen por motivo de las circunstancias de su nacimiento[20] y todos los hijos están en igualdad de derechos respecto de sus padres y del orden jurídico, resultando constitucionalmente impermisible que se sufra, por razón de esas circunstancias, de inferioridades

---

[20] La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 257, dispone:

"La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza,* color, sexo, *nacimiento,* origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de *esencial igualdad humana.*"(Énfasis suplido.)

jurídicas.([21]) Permitir lo contrario podría constituir la negación del derecho a la igual protección de las leyes.([22])

█ Es debido a lo anteriormente señalado que somos del criterio que la diferencia existente en la actualidad en nuestro ordenamiento, referente la misma a los términos para radicar las acciones de impugnación de legitimidad y del reconocimiento, *no* puede subsistir. Como sabemos, por virtud de las disposiciones del citado Art. 117 del Código Civil, el marido tiene el término de tres meses desde la inscripción del nacimiento, si se hallaba en Puerto Rico, y el término de seis meses desde que tuvo conocimiento del nacimiento, si se hallaba fuera de Puerto Rico, para radicar la acción de impugnación de legitimidad. Ello tiene la consecuencia de que el niño que nace de mujer casada *consolida su estado filiatorio* respecto de su padre al transcurrir dichos períodos de tres o seis meses, pues pasado "el mismo"

---

([21]) La Comisión de la Convención Constituyente encargada del estudio de la Carta de Derechos, en su informe, hizo constar el alcance de la palabra *"nacimiento"* en el Art. II de la Constitución:

*"Nacimiento.* Se propone eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio. *Se coloca a todos los hijos respecto de sus padres y respecto del orden jurídico en igualdad de derechos.* Las uniones ilícitas pueden y deben estar prohibidas y esta disposición tendrá como una de sus consecuencias el desalentarlas. Pero el fruto inocente de ellas, *debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas.* Así lo exige el principio de la responsabilidad individual, con arreglo a la cual nadie es culpable por los actos que él mismo no realiza. Aunque la legislación actual ya cubre en casi su totalidad lo aquí dispuesto, será menester nueva legislación. A los fines de herencias y propiedades las modificaciones resultantes de esta sección no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia." (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2562 (1951).

([22]) Dispone la Sec. 7 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 275:

"Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, *ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.* No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo." (Énfasis suplido.)

su *status familiae* resulta ser inatacable por el padre por razón de haber *caducado* la acción que a esos efectos la ley le concede a éste.

■ Conforme la doctrina jurisprudencial vigente, sin embargo, la situación de los hijos no matrimoniales no es tan afortunada. Según lo resuelto por este Tribunal en *Alcaide v. Morales*, ante, el término que tiene el padre que reconoció al hijo para impugnar dicho reconocimiento lo es el de quince años. Ello significa que el hijo nacido de mujer soltera que es reconocido —que como hemos visto es tan hijo como el hijo de mujer casada— no consolida su estado filiatorio hasta que transcurra dicho largo período de tiempo.

La mencionada norma jurisprudencial coloca a los hijos nacidos de mujer soltera que son reconocidos en un *estado de desigualdad* en relación a los hijos nacidos de mujer casada. Es como si el estado filiatorio que crea el reconocimiento fuera de menor categoría que el que surge por operación de la presunción que establece el citado Art. 113 del Código Civil. Procede que determinemos, en consecuencia, si esta clasificación que perpetuó la norma jurisprudencial vigente, la cual resulta ser inherentemente sospechosa a la luz de las disposiciones de la Sec. 1 del Art. II de nuestra Constitución, ante, infringe o no la cláusula constitucional sobre igual protección de las leyes. Venimos obligados a así hacerlo no obstante el hecho de que esta clasificación es de "origen" jurisprudencial. Como expresáramos anteriormente,[28] si bien es cierto que el análisis constitucional sobre la igual protección de las leyes tradicionalmente se ha aplicado en el contexto de clasificaciones legislativas, el mismo es igualmente aplicable a clasificaciones establecidas o legitimidas jurisprudencialmente. El examen referente a estas "clasificaciones judiciales" resulta procedente por razón de que los derechos

---

[28] Véase esc. 13.

constitucionales se reclaman contra el Estado, y la Rama Judicial es uno de los componentes de éste. Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 1482-1483.

## VIII

Como es de todos conocido, en el análisis constitucional bajo la referida cláusula de la igual protección de las leyes se utilizan tres criterios *(tests)*, a saber: (1) el de escrutinio estricto o del examen minucioso; (2) el intermedio, y (3) el tradicional mínimo o de nexo racional. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 537 (1984); *Zachry International v. Tribunal Superior*, ante.[24]

En *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980) —citando con aprobación lo expresado en *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972)— señalamos, en lo pertinente, que:

> ... están sujetas a un minucioso examen judicial, por considerarse inherentemente sospechosas, todas las clasificaciones tangentes con la dignidad del ser humano y con el principio de la igualdad ante la ley. Caen bajo esta categoría las clasificaciones o discrímenes por motivo de raza, color, sexo, *nacimiento*, origen o condición social, ideas políticas o religiosas y nacionalidad. (Énfasis suplido y escolio omitido.)

En casos como el de autos —donde nos enfrentamos a una clasificación inherentemente sospechosa— para que la constitucionalidad de la misma pueda ser sostenida, el Estado viene en la obligación de demostrar la existencia de un interés público apremiante o de superior jerarquía (*compelling state interest*) que justifique la referida clasificación y que la misma promueve necesariamente la consecución de

---

[24] Este Tribunal nunca ha aplicado el escrutinio intermedio. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

ese interés. *Zachry International v. Tribunal Superior*, ante, pág. 278.

Cuando este Tribunal resolvió en 1920 el caso de *Alcaide v. Morales*, ante, no estábamos obligados por precepto constitucional alguno que reclamara trato igual para todos los hijos independientemente de sus circunstancias al nacer. En aquel entonces concluimos —en correcta técnica jurídica— que en ausencia de precepto legislativo alguno que regulara el plazo para la impugnación de un reconocimiento debíamos aplicar uno por analogía. Determinamos, entonces, que tratándose de una acción personal sin término señalado debía aplicarse el término de quince años que dispone el Art. 1864 del Código Civil de Puerto Rico, ante. Posteriormente, y luego de promulgada nuestra Constitución en el año 1952, en *Rivera v. Rivera*, 78 D.P.R. 908 (1956), *incorrectamente ratificamos* —en una nota al calce y por medio de *dictum*— la norma establecida en *Alcaide v. Morales*, ante, a los efectos de que un hombre que ha reconocido a un hijo tiene el término de quince años para impugnar dicho reconocimiento.

En vista del planteamiento que hace la parte demandada peticionaria en el presente caso, procede que nos preguntemos: ¿qué "interés apremiante" puede perseguir "el Estado" al establecer términos distintos para la consolidación del estado filiatorio? Debemos confesar que, únicamente, se nos ocurre como base o fundamento para dicha clasificación el interés del Estado de fomentar la institución del matrimonio.

 Debe quedar meridianamente claro que entendemos que la protección de la institución del matrimonio en efecto constituye un interés apremiante del Estado.[25]

---

(25) De no ser así, no podría constitucionalmente subsistir la presunción de hijo matrimonial que nuestro Código Civil establece. Esto es, para que hubiese una total equiparación de los hijos se requeriría la eliminación de esta presun-

Ahora bien, ante esta realidad, ¿constituye la desigualdad creada por la clasificación en controversia el medio necesario de alcanzar esa protección justificándose que se discrimine en contra de los hijos no matrimoniales? Entendemos que no. Somos del criterio que el Estado puede promover y fortalecer la institución del matrimonio por otros medios.[26] No hay necesidad de castigar al inocente. Como correcta y certeramente expresara en *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175 (1972), el Tribunal Supremo de los Estados Unidos:

> The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. *But visiting this condemnation on the head of an infant is illogical and unjust.* Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility of wrongdoing. *Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent.* Courts are powerless to prevent the social opprobrium suffered by these hapless children, *but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise.* (Énfasis suplido y citas omitidas.)

Resolvemos, en consecuencia, que en virtud de lo dispuesto en el citado Art. II, Secs. 1 y 7 de la Constitución del Estado Libre Asociado de Puerto Rico sólo puede existir en nuestro ordenamiento un *único* plazo para la radicación

---

ción. Sin embargo, como ya hemos explicado, tal eliminación constituiría una aberración jurídica.

[26] Véase H.D. Krause, *Illegitimacy: Law and Social Policy*, New York, The Bobbs-Merrill Company, Inc., 1971, pág. 76: "if the state really wishes to discourage casual unions, it should do so directly. It could do so by enforcing laws punishing fornication or by providing incentives for marriage." (Escolios omitidos.)

de la acción de impugnación del "estado o condición de hijo", se le llame a la misma acción de impugnación del reconocimiento o acción de impugnación de "legitimidad". Al así resolver, como expresáramos en *García v. Acevedo*, 123 D.P.R. 624, 635 (1989), lo "único que estamos haciendo es darle plena virtualidad al axioma constitucional que prohíbe el discrimen por razón de nacimiento y proclama la igualdad del ser humano".

## IX

Habiendo resuelto que nuestra Constitución exige un único plazo de caducidad para la radicación tanto de la acción de impugnación del reconocimiento como para la acción de impugnación de la "legitimidad", procede que determinemos cuál debe ser ese plazo. Ello realmente es una labor o función que corresponde, en primera instancia, al legislador. Constituye una realidad inescapable, sin embargo, el hecho de que nuestra Asamblea Legislativa ha rehusado actuar al respecto a pesar de los llamados que a esos efectos se le han hecho.[27] No vislumbrándose que lo haga en un futuro cercano e ignorando las razones que tenga la Asamblea Legislativa para su inacción, no podemos eludir la obligación de esbozar una norma que corrija la injusticia.

Ya anteriormente habíamos descartado, por inaplicable e irrazonablemente largo, el plazo de quince años que esta-

---

[27] En *Ramos v. Marrero*, 116 D.P.R. 357, 362-363 (1985), citando con aprobación a F. Rivero Hernández, *La presunción de paternidad legítima*, Madrid, Ed. Tecnos, 1971, pág. 487, dijimos que nuestro régimen de impugnación de paternidad: "[E]s el sistema de impugnación más deficiente y arbitrario de cuantos hemos visto, el más estrecho y riguroso, el más anacrónico y superado por la evolución de las ideas y realidad social y científica de nuestros días. Las concepciones biológicas y jurídicas en que se fundara son hoy práctica y absolutamente inservibles, y el marco legal de la institución ha quedado tan estrecho que la violenta como una camisa de fuerza, hasta deformarla."

Véase, en adición, C.E. Mascareñas, *Algunas consideraciones sobre la filiación de los hijos extramatrimoniales y los derechos de los mismos*, 10 Rev. Der. Pur. 173, 179 (1963).

blece el Art. 1864 del Código Civil, ante, para las acciones "personales que no tengan señalado término especial de prescripción . . .". Las alternativas, en consecuencia, se limitan a los términos de caducidad que establecen los antes citados Arts. 117 y 1253 del vigente Código Civil; esto es, los plazos de 3 y 6 meses que establece el primero para la radicación de la acción de impugnación de la "legitimidad" o el plazo de cuatro años que dispone el segundo para la acción de nulidad de contratos.

Según ya hemos explicado, la doctrina española mayoritaria *antes de la reforma de 1981* se inclinaba hacia la utilización del plazo de caducidad de cuatro años. Ello así por tres razones principales, a saber: se utilizan las mismas "causales" —error, violencia e intimidación— en apoyo de la solicitud de nulidad o impugnación; se trata de un término más razonable; y, sobre todo, el mismo es un plazo de caducidad. Puig Brutau, *op. cit.*, ed. 1978, pág. 323. A esos efectos Puig Brutau sostuvo que, "como opina Albaladejo, es preferible mantener el criterio del plazo de caducidad de cuatro años, que 'aplicar por analogía el art. 113 [el Art. 117 nuestro, ante] (en lo que sea aplicable) que, aunque se piense que es propiamente el indicado, por tratarse de un caso de impugnación de un estado de filiación, regula en realidad las cosas sobre la base de unas circunstancias radicalmente distintas de las del caso del reconocimiento impugnable por vicio de la voluntad'". Puig Brutau, *op. cit.*, ed. 1970, pág. 95; Albaladejo, *El reconocimiento de la filiación natural, op. cit.*, pág. 217; De la Cámara Álvarez, *Reflexiones sobre la filiación ilegítima en Derecho español, op. cit.*, pág. 98 n. 118.

Ahora bien, respecto a lo antes señalado, debe mantenerse presente que, con anterioridad a la reforma de la filiación, en España se sostenía que la acción de impugnación del reconocimiento era una declaración de voluntad constitutiva de un negocio jurídico de derecho de familia. Esto es, constituyendo esta acción un negocio jurídico y existiendo una pa-

tente desigualdad entre los hijos por razón de su nacimiento era lógico pues la aplicación del Art. 1253, ante (el Art. 1301 del Código Civil español) que certeramente regula los negocios jurídicos. Sin embargo, ya habíamos afirmado con anterioridad que "el reconocimiento en la actualidad no cumple, pues otra función que la de determinar la filiación, *y para esta finalidad no es necesario un negocio jurídico ni una voluntad negocial.* La creación de la relación de filiación es ahora obra de la ley, no de los particulares, que no pueden disponer de los efectos jurídicos". (Énfasis suplido.) Serna Meroño, *op. cit.*, pág. 240.

Por otro lado, hubo quien postulara, mucho antes de la reforma española, que el plazo que se debía utilizar para regular la acción de impugnación del reconocimiento lo era el establecido por el Art. 117, ante (Art. 113 español) por regular la misma materia. Con mucha certeza Piñar López sostuvo que:

> En todo caso y a nuestro modo de ver, la impugnación de que habla el art. 128 no está sujeta a la prescripción de los quince años que señala el art. 1.964 del Código civil. Este plazo, excesivamente largo, como dicen los autores que en última instancia lo estiman aplicable, hay que reputarlo vigente para el solo caso de que en la ley no se fijen plazos especiales. Ahora bien, si mediante la legitimación el hijo adquiere el *status* propio del hijo legítimo, ni que decir tiene que habrá de aplicarse, por lo que respecta a la contestación de este estado, el breve plazo, no de prescripción, *sino de caducidad del art. 113 del Código* . . . . (Énfasis suplido.) Piñar López, *Legitimación por concesión real*, 6 An. Der. Civ. 353 (1953).

█ Como sabemos, para establecer un plazo de caducidad o prescripción el análisis a utilizarse es el de balance de intereses. Este tipo de análisis es utilizado cuando entran en conflicto derechos de dos partes privadas. *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975); *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974); *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982). El punto preciso

donde se establece el balance depende de la intensidad del derecho de cada una de las partes envueltas.

Al establecer los plazos de caducidad del Art. 117 del Código Civil, ante, el legislador hizo un balance entre el derecho de un individuo a deshacer una realidad jurídica inexacta y el derecho de una persona a la seguridad de su estado civil, así como el interés del Estado en la estabilidad de las relaciones filiatorias. Estos mismos derechos son los que deben ser armonizados al disponerse un término para las acciones de impugnación de reconocimiento. Habiendo el legislador hecho este balance de intereses al disponer los plazos contenidos en el Art. 117, ante, entendemos que no debemos nosotros disponer un término distinto para las acciones de impugnación de reconocimiento. Repetidamente hemos sostenido que cuando la ley no fija el término dentro del cual deberá llevarse determinada acción, deberá aplicarse a la misma el más análogo. *Cf. Olmo v. Young & Rubicam of P.R., Inc.*, 110 D.P.R. 740, 745 (1981); *Lozada Torres v. Collazo*, 111 D.P.R. 702, 704 (1981). Este, en nuestro criterio, lo es el término de tres meses que establece el citado Art. 117 del vigente Código Civil. *Resolvemos, en consecuencia, que la acción de impugnación del reconocimiento deberá ser radicada dentro del plazo de caducidad de tres meses, contado el mismo a partir de la fecha en que se inscribe dicho reconocimiento en el Registro Demográfico o desde la fecha del documento público correspondiente en que se lleva a cabo el mismo.*(28) El caso de *Alcaide v. Mo-*

---

(28) Debe mantenerse presente que el reconocimiento que se ha hecho constar en forma auténtica y fehaciente, por ejemplo, en actas de nacimiento, testamentos, actuaciones judiciales, declaraciones juradas, etc., tiene el efecto de eximir al reconocido de acudir a la acción civil filiatoria. *Puente et al. v. Puente et al.*, 16 D.P.R. 582, 585 (1910). Véanse, en adición: *Ex parte Hernández*, 65 D.P.R. 142 (1945); *Iturrino v. Iturrino*, 24 D.P.R. 467 (1916); *González et al. v. López et al.*, 19 D.P.R. 1113 (1913); *Figueroa v. Díaz et al.*, 19 D.P.R. 717 (1913); *Bianchi v.*

*rales*, ante, queda revocado, en forma específica y exclusiva, en cuanto a la norma en el mismo establecida de que la acción de impugnación del reconocimiento prescribe a los quince años.

█ Lo anteriormente expresado no significa, sin embargo, que en aquellos casos en que el reconocimiento realizado es producto de la violencia o la intimidación, el reconocedor queda huérfano de remedio por el mero transcurrir del término de tres meses desde la fecha del "reconocimiento" realizado. Debe recordarse que la caducidad no corre contra lo inexistente. *Cf. Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 189 (1985). En otras palabras, en aquellas situaciones en que la violencia o la intimidación es de tal grado que causa la ausencia total de consentimiento, el reconocedor tendrá un plazo de caducidad de tres meses para impugnar el "reconocimiento" realizado, contado el mismo a partir de la fecha en que cesó el vicio mencionado.

█ En cuanto a la impugnación del reconocimiento debido a "error", el término de caducidad de tres meses necesariamente debe contarse desde la fecha en que se llevó a cabo el reconocimiento.[29] En cuanto a este punto específico, conviene recordar lo expresado a esos efectos en el citado

---

*Sucn. Bianchi*, 67 D.P.R. 594 (1947); *Medina v. Sucesión de Bird et al.*, 30 D.P.R. 158 (1922); *Servera v. Otero*, 22 D.P.R. 367 (1915); *Rodríguez v. Rodríguez et al.*, 18 D.P.R. 440 (1912); *Rivera v. Rivera*, 78 D.P.R. 908 (1956); *Rodríguez v. Rodríguez*, 35 D.P.R. 883 (1926); *Pabón v. Alvarado et al.*, 28 D.P.R. 579 (1920); *Ex parte Morales*, 30 D.P.R. 907 (1922); *Ramos v. Rosario*, 67 D.P.R. 683 (1947); *Díaz Fontánez v. Sucn. Díaz*, 86 D.P.R. 798 (1962).

[29] Si ello es así en obligaciones y contratos, no hay motivo para que en el campo de la filiación, donde tan necesaria es la seguridad del estado filiatorio, el punto de partida para computar el plazo sea diferente. Por la trascendencia del acto del reconocimiento, aquel que reconoce a un "hijo" tiene el deber de asegurarse en los casos en que tiene alguna duda respecto a su paternidad de que el niño verdaderamente es suyo antes de reconocerlo. Las pruebas biológicas excluyentes de la paternidad son una forma sencilla y altamente confiable de descubrir si no es el padre biológico de un niño. *Cf. Ortiz v. Peña*, 108 D.P.R. 458 (1979).

caso de *Alcaide v. Morales*, ante, y, en adición, unas palabras del Tribunal Supremo de España a los efectos de que es preciso que el error alegado "se compruebe y derive de hechos transcendentales que afecten directa y notoriamente [a] la creencia equivocada en que pudo estar el padre de que la madre sólo de él pudo concebir, sin que sea lícito de otro modo la suposición del error, pues equivaldría [a] autorizar un arrepentimiento y cambio de voluntad, que es en absoluto incompatible con las condiciones de permanencia de todo estado civil, permanencia que afecta al interés social y consiguientemente al orden público . . . ". S. de 25 de junio de 1909, Núm. 93, 115 Jurisprudencia Civil 499.

## X

La nueva norma jurisprudencial establecida —la cual, naturalmente, revoca la norma establecida en el citado caso de *Alcaide v. Morales*, ante, y su progenie— ¿debe tener carácter, o efecto, retroactivo o prospectivo?

No hay duda que cuando se revoca una norma jurisprudencial, a los fines de proporcionarle estabilidad al derecho, resulta, cuando menos, altamente deseable que este Tribunal dictamine que la nueva norma sea de vigencia prospectiva; en especial, cuando de derechos contractuales o de propiedad se trata. Art. 3 del Código Civil, 31 L.P.R.A. sec. 3;[30] Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, ante. ¿Debe ello ser así en casos como el presente?

En lo pertinente, en *Ocasio v. Díaz*, ante, pág. 728, expresamos que "[s]abemos que la absoluta retroactivi-

---

[30] Dispone el Art. 3 del Código Civil, 31 L.P.R.A. sec. 3:
"Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario.
"En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior."

dad del derecho positivo sería la muerte de la seguridad y de la confianza jurídica; pero también sabemos que la absoluta irretroactividad sería la muerte del desenvolvimiento del Derecho. El respeto a los derechos adquiridos, a los hechos consumados, a las situaciones ya existentes, no se opone al establecimiento de reformas sociales constitucionales ni a leyes que se dan en vista de situaciones pasadas. La tendencia moderna, tanto en la doctrina como en la legislación, consiste en limitar todo lo posible el principio de la irretroactividad, excepto en materia de contratos, que en muchos países, como en Alemania, se mantiene, no obstante, en toda su pureza. Aquí esa tendencia se acoge en el Art. 3 de nuestro Código Civil, al disponer que las leyes no tendrán efecto retroactivo, *si no dispusieren lo contrario . . .".* (Énfasis en el original.)

Scaevola, al comentar el artículo del Código Civil español equivalente a nuestro Art. 3, expresa que sería "contrario a la esencia del Poder legislativo el que éste estuviese como atado por la regla de que la ley no dispone más que para el porvenir . . . . Hay casos . . . *en que la ley debe regir el pasado, sea en interés social, sea en interés de los ciudadanos.* De aquí que el legislador no debe estar encadenado por un principio absoluto, que coartaría su libertad de acción en perjuicio de la sociedad y los individuos". (Énfasis suplido.)[31]

■ Mediante la decisión que hoy se emite intentamos corregir, aun cuando tardíamente, una grave injusticia que inexplicablemente se había mantenido vigente en nuestro ordenamiento. Como expresara este Tribunal en *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 396 (1973), al discutir la procedencia de la aplicación retroactiva de una ley aprobada por la Asamblea Legislativa, mientras "más grave

---

[31] Q.M. Scaevola, *Código Civil*, 6ta ed., Madrid, Ed. Reus, 1949, T. 1, pág. 237.

sea el mal social que el estatuto intenta remediar más grande es el interés público envuelto, y, por tanto, mayor justificación para su aplicación retroactiva".

El interés público envuelto en el presente caso no puede ser más grande. Está en juego nada más y nada menos que el derecho a la igualdad de los hijos nacidos en nuestra tierra, derecho garantizado expresamente por nuestra Constitución. *Ese alto interés público nos obliga a la aplicación retroactiva de la norma jurisprudencial que hoy adoptamos.* Resolver lo contrario equivaldría a perpetuar por más tiempo el discrimen impermisible que hoy erradicamos de nuestro ordenamiento.

 Resolvemos, en consecuencia, que *procede la desestimación de la demanda de impugnación de reconocimiento que el demandante recurrido radicara ante el Tribunal Superior de Puerto Rico, Sala de Mayagüez, por razón de haber caducado la misma.*(32)

*Se dictará sentencia de conformidad.*(33)

---

(32) Pudiendo los tribunales hacer valer la caducidad *ex officio judicis, Ortiz Rivera v. Sucn. González Martínez,* 93 D.P.R. 562, 599 (1966), procede igualmente que se decrete la desestimación, por razón de caducidad, de toda causa de acción similar pendiente ante nuestros tribunales si la misma no fue presentada dentro del término de tres meses de haberse realizado el reconocimiento.

(33) El Art. 126 del Código Civil, 31 L.P.R.A. sec. 505, dispone, en lo pertinente, que el "reconocimiento hecho a favor de un hijo que no reúna las condiciones del párrafo primero de la sec. 504 de este título podrá ser impugnado por aquéllos a quienes perjudique". Luego de la decisión que hoy emitimos dicho artículo tiene que ser interpretado a la luz de lo preceptuado en el Art. 116 del Código Civil y la jurisprudencia aplicable al mismo. Así, la impugnación del reconocimiento puede hacerse por el padre biológico, *Cf. Ramos v. Marrero,* 116 D.P.R. 357 (1985); por el propio reconocido —incidentalmente— en las circunstancias en que esté reclamando una filiación incompatible, *Cf. Roblés López v. Guevárez Santos,* 109 D.P.R. 563 (1980), *Agosto v. Javierre,* 77 D.P.R. 471 (1954), y por los herederos según lo establecido en el referido Art. 116. Quedan revocados expresamente los casos *Fernández v. Sucn. Fernández,* 66 D.P.R. 881 (1947), y *Rossy v. Martínez,* 70 D.P.R. 737 (1949).